DENVER UNION STOCK YARD· CO. *v.* UNITED
STATES ET AL.

No. 798.   Argued April 27, 1938.—Decided May 31, 1938.

*Mr. Robert G. Bosworth,* with whom *Mr. Winston S. Howard* was on the brief, for appellant.

*Mr. Wendell Berge,* with whom Solicitor General *Jackson,* Assistant Attorney General *Arnold,* and *Messrs. James C. Wilson, Raymond J. Heilman,* and *Mastin G. White* were on the brief, for appellees.

MR. JUSTICE BUTLER delivered the opinion of the Court.

November 8, 1934, the Secretary of Agriculture initiated proceedings in which, February 17, 1937, after extended investigation, taking of much evidence and full hearing, he made findings of fact and an order, prescribing maximum rates to be charged by appellant for services

rendered by it.[1] March 9, 1937, it commenced this suit[2] to set aside the order on the ground that the prescribed rates are confiscatory and that enforcement of the order would deprive the company of its property without due process of law in violation of the Fifth Amendment. The case was submitted on stipulations and the evidence before the Secretary. The court made findings of fact, stated conclusions of law, announced opinion, 21 F. Supp. 83, and entered decree dismissing the bill.

The challenged rates include marketing charges per head; they are applicable only when sales are made, and are the same without regard to the time the stock remains in the pens. These are called "yardage charges." Appellant makes no charge for use, as such, of pens or other facilities; its charges for feed, bedding and other services are regulated by the order. About three-fourths of the total number of animals received at the yard are sold there. Some are sold to traders, also called dealers and speculators, and held in the yard until sold again.

---

[1] 7 U. S. C. § 211. "Whenever after full hearing . . . the Secretary is of the opinion that any rate, charge, regulation, or practice of a stockyard owner or market agency, for or in connection with the furnishing of stockyard services, is or will be unjust, unreasonable, or discriminatory, the Secretary—

"(a) May determine and prescribe what will be the just and reasonable rate or charge, or rates or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what regulation or practice is or will be just reasonable, and nondiscriminatory to be thereafter followed; and

"(b) May make an order that such owner or operator (1) shall cease and desist from such violation to the extent to which the Secretary finds that it does or will exist; (2) shall not thereafter publish, demand, or collect any rate or charge for the furnishing of stockyard services other than the rate or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be; and (3) shall conform to and observe the regulation or practice so prescribed."

[2] 7 U. S. C. § 217; 28 U. S. C. §§ 44, 47 (a).

Appellant has never made any charge against traders for resales or reweighing for sale except when the resale was through commission men. For that service, the order prescribes rates which for convenience may be referred to as "yardage charges to traders." Appellant's activities are not confined to services covered by the order. It unloads and loads livestock from and into cars of railroads serving the yard, and receives from the carriers compensation not regulated by the Secretary. If enforced, the order will reduce revenue from charges for yardage services by about eight and one-half per cent, and from charges for other services by about nineteen per cent; miscellaneous revenues in a substantial amount are not affected; total revenue will be reduced by about eight and one-half per cent.[3]

To ascertain the amount on which appellant is entitled to earn a return, the Secretary determined what land and structures were used and useful for performance of the services, and to present value of land added cost of reproduction new less depreciation of structures, and allowances on account of a bridge and sewage disposal plant being built, and working capital. The total is slightly less than $2,792,700, which the Secretary adopted as rate base. He found six and one-half per cent to be a reasonable rate of return, $530,117 the revenue procurable if prescribed charges be put in effect, and $346,545 the operating expenses, leaving a net return of $183,572, slightly more than six and one-half per cent on the value of the property.

Appellant accepts as correct the Secretary's estimate of cost of reproduction less depreciation of property found to be used and useful, and also the allowances above men-

---

[3] The Secretary in his brief furnishes the Court the following statement. "The revenues produced from an application of the rates prescribed by the Secretary to the volume of business used by him as a

tioned. But it objects to his exclusion of land and improvements used for a stock show and for trackage and facilities for unloading and loading livestock, to his valuation of the land, to his treatment of going concern value, to his refusal to allow certain items that it claims to be operating expenses, and to the rate of return found by him to be reasonable.

---

rate factor are $530,117. The revenues produced by an application of the rates under investigation to the volume used by the Secretary as a rate factor are $579,342. The $530,117 produced by the prescribed rates is 91.5% of the $579,342 produced by the rates under investigation.

"The following table shows the method and computations by which these results were obtained:

| | Volume used as a rate factor | Rates under investigation | Revenues from rates under investigation | Rates prescribed | Revenues from rates prescribed |
|---|---|---|---|---|---|
| Yardage: | | | | | |
| Cattle: | | | | | |
| Rail | 325,000 | $0.35 | $113,750 | $0.30 | $97,500 |
| Truck-ins | 75,000 | .40 | 30,000 | .35 | 26,250 |
| Resales | 56,000 | | | .15 | 8,400 |
| Bulls | 850 | 1.00 | 850 | 1.00 | 850 |
| Calves: | | | | | |
| Rail | 20,000 | .25 | 5,000 | .20 | 4,000 |
| Truck-ins | 30,000 | .27 | 8,100 | .25 | 7,500 |
| Resales | 3,000 | | | .10 | 300 |
| Hogs: | | | | | |
| Rail | 25,000 | .12 | 3,000 | .12 | 3,000 |
| Directs | 145,000 | .12 | 17,400 | .06 | 8,700 |
| Truck-ins | 225,000 | .14 | 31,500 | .14 | 31,500 |
| Resales | 250 | | | .06 | 15 |
| Sheep: | | | | | |
| Rail | 2,000,000 | .08 | 160,000 | .075 | 150,000 |
| Truck-ins | 80,000 | .10 | 8,000 | .10 | 8,000 |
| Resales | 75,000 | | | .03 | 2,250 |
| Horses & mules | 6,000 | .35 | 2,100 | .35 | 2,100 |
| Total yardage | | | $379,700 | | $350,365 |
| | | | | | |
| Feed, Bedding, Etc.: | | | | | |
| Hay, cwt. on fence | 136,000 | .609 | 82,824 | .50 | 68,000 |
| Hay, cwt. fed | 34,000 | .609 | 20,706 | .60 | 20,400 |
| Corn, bu | 20,000 | .651 | 13,020 | .45 | 9,000 |
| Straw, bales | 18,500 | .44 | 8,140 | .40 | 7,400 |
| Misc. feed, lbs | 150,000 | | 1,000 | | 1,000 |
| Total revenue procurable | | | $125,690 | | $105,800 |
| Misc. Revenue | | | 73,952 | | 73,952 |
| Total revenue procurable | | | $579,342 | | $530,117 |
| | | | 100.0% | | 91.5% |

*The rate base.* As of right safeguarded by the due process clause of the Fifth Amendment, appellant is entitled to rates, not *per se* excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of property used, at the time it is being used, to render the services. *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 41. *Minnesota Rate Cases,* 230 U. S. 352, 434. *Bluefield Water Works Co.* v. *Public Service Comm'n,* 262 U. S. 679, 690. *Board of Commissioners* v. *New York Telephone Co.,* 271 U. S. 23, 31. *McCardle* v. *Indianapolis Water Co.,* 272 U. S. 400, 414. *Los Angeles Gas Co.* v. *Railroad Comm'n,* 289 U. S. 287, 305. But it is not entitled to have included any property not used and useful for that purpose. Cf. *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 56.

*The stock show property excluded.* The stock show is held on property owned by appellant and is conducted by an incorporated association not organized for pecuniary profit. It continues for about one week in January of each year. The Secretary found a part of that property, which is operated by the Colorado Horse and Mule Company, to be used and useful for performance of services covered by the rates regulated by him, and included it in the rate base. He appraised the rest of the show property, which consists of 2.633 acres and improvements thereon, at $219,033, but excluded it as not used for the performance of services covered by the rates he regulates.

For payment of expenses of the show there is used the money received for admission to it and to other events on the property, and also some that is donated for that purpose. Appellant assumes the carrying charges, including interest and taxes; when the show is unable to pay rental sufficient to cover all charges, appellant ab-

sorbs the deficit. It requested findings in substance as follows: Large quantities of livestock are entered in the show and much is sold on the show property. Some is sold in the yards operated by appellant. The show attracts buyers and throughout the year widens the outlet for producers' stock, operates to increase receipts, makes for improvement of stock raised and for higher prices, has educational value, and advertises the market. It is supported by appellant in good faith and in the belief that it stimulates its business and that of livestock producers. These facts are not in substantial conflict with the Secretary's findings, and may be taken as established by the evidence. But they are not sufficient to prove that the property excluded is used and useful for the performance of services covered by rates being regulated by the Secretary. None of those services is performed on or by the use of any of that property. The Secretary rightly says "If it is appellant's contention that the stock show increases the stockyard business, then it should request that a reasonable allowance be made for advertising expense as a charge against its income." In support of that view he adds "Advertising or developmental expenses to foster normal growth are legitimate charges upon income for rate purposes if confined within the limits of reason. *West Ohio Gas Co.* v. *Comm'n*, 294 U. S. 63, 72." Appellant's contention that the court erred in upholding the Secretary's exclusion of that item is not sustained.

*Trackage and unloading and loading facilities.* The Secretary appraised that property at $177,108. He excluded it as not used for performance of any stockyard service. Appellant leases the trackage to railroad carriers for substantial rentals. It does not claim that exclusion of that part of the item is confiscatory and fails to show it prejudicial. It follows that the court did not err in upholding the Secretary's determination. The unloading

and loading facilities include ways between docks and the pens where the stockyard services are rendered. Appellant uses these facilities to unload and load livestock. That is a service for which the carriers pay appellant. Stockyard services do not commence until unloading ends; they end when loading begins. See *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193, 198. The court rightly refused to disturb the Secretary's ruling as to these facilities.

*Land value.* The Secretary's finding depends on the appraisal and testimony of his valuation engineer. Appellant maintains that it is not supported by evidence because the engineer was not a qualified expert witness. It concedes that, if he was competent, the valuation must be sustained. To support its point, appellant relies on the fact that the appraiser had never lived in Denver or previously appraised any land there or in that vicinity or assembled or appraised any large industrial tracts. The significance adverse to competency that might be attributed to these facts if they stood alone is negatived by others disclosed by the record. The appraiser is an experienced civil engineer; he was long engaged in land appraisal work under the Interstate Commerce Commission. He later had private practice as consulting engineer and in 1934 became principal valuation engineer of the Packers and Stockyards Division, Bureau of Animal Industry, Department of Agriculture; in that capacity he has given testimony in a number of rate proceedings. His report submitted to the Secretary discloses elaborate investigation and consideration of prices paid for land, of the Interstate Commerce Commission's appraisals of lands in the vicinity and of other facts material to the ascertainment of value of the land in question. It cannot reasonably be said that, because of his lack of earlier knowledge of local conditions, the finding was made without evidence.

*Going concern value.* Appellant maintains that, while admitting it exists in the property, the Secretary failed to include in rate base any allowance on account of it, and that the evidence requires addition of at least $325,000 to cover that element.

In substance, the Secretary's findings state: The stockyard is a going concern; it has a long history of efficient management and has won a reputation for good service; it has been financially successful. His valuation engineer (whose figures and valuation are the basis of the Secretary's appraisal) considered going concern value but did not include a separate amount for it. In adopting the value of the land and the cost of reproduction new less depreciation of structures, consideration was given to the element of going concern value. Adequate allowance has been included, although no separate item on its account has been set forth. The findings contain a "summary of the value of used and useful land, the cost of reproduction new of structures and equipment, including direct construction overheads, indirect overheads, interest on used and useful land during construction, and working capital, and the cost of these, less depreciation where depreciation exists, of respondent [appellant] as a going concern.[4] . . . It is found that the fair value of the property of respondent as a going concern is $2,792,681 . . ."

---

[4] See table below:

| | Cost of reproduction new | Condition per cent | Cost of reproduction new less depreciation |
|---|---|---|---|
| Land—Used and Useful | $536,825 | 100 | $536,825 |
| Total Material, Labor, Direct Construction Overhead and Indirect Construction Overhead | 2,532,484 | 80.545 | 2,039,789 |
| Interest on Used and Useful Land during Construction | 37,578 | 80.545 | 30,267 |
| Working Capital | 139,300 | 100 | 139,300 |
| Total on Basis of Original Testimony | | | $2,746,181 |
| Bridge in Process of Construction at Date of Oral Argument | | | 22,500 |
| Sewage Disposal Plant in Process of Construction at Date of Oral Argument | | | 24,000 |
| Total | | | $2,792,681 |

The substance of appellant's claim is that these figures are exclusively attributable to physical elements. Assuming that to be true, it does not follow that the Secretary failed to include proper allowance for going concern. *Dayton P. & L. Co.* v. *Comm'n,* 292 U. S. 290, 309. The value of appellant's property used in stockyard services is single in substance. *West* v. *Chesapeake & P. Tel. Co.,* 295 U. S. 662, 672. While it may be considered as made up of tangible and intangible elements, it is not necessarily to be appraised by adding to cost figures attributable to mere physical plant something to cover the value of the business. *Kennebec Water District* v. *Waterville,* 97 Me. 185, 220; 54 A. 6. Value depends upon use and is measured, or at least significantly indicated, by the profitableness of present and prospective service rendered at rates that are just and reasonable as between the owner of and those served by the property. *Cleveland, C., C. & St. L. Ry Co.* v. *Backus,* 154 U. S. 439, 445. *National Waterworks Co.* v. *Kansas City,* 62 F. 853, 864–866. *Omaha* v. *Omaha Water Co.,* 218 U. S. 180, 202. *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 165. *Denver* v. *Denver Union Water Co.,* 246 U. S. 178, 192. Cf. *Public Service Comm'n* v. *Great Northern Utilities Co.,* 289 U. S. 130. It is elementary that value of a going concern may be less than, equal to, or more than, present cost of plant less depreciation plus necessary supplies and working capital. See *Galveston Electric Co.* v. *Galveston,* 258 U. S. 388, 396. *Los Angeles Gas Co.* v. *Railroad Comm'n, supra,* 313, 314. *Dayton P. & L. Co.* v. *Comm'n, ubi supra.* Appellant's plant without business, present or prospective, would be worth much less than the cost figures found by the Secretary to represent value. Appellant's claim, that the rate base includes nothing on account of going concern value, is without foundation in fact.

The considerations upon which appellant claimed to have established an amount to be added to rate base to

cover going value may be summarily stated: (1) The sales charge is for the privilege of the market. The value of the market is not reflected in reproduction cost of structures. It is over and above value of or investment in plant. (2) Appellant has spent large sums and made gifts of money and land as a result of which large packers have their plants at Denver and buy on appellant's market. (3) Cattle of various owners arriving at the Denver market by rail for the same market session from different shipping points may be sorted into uniform carloads to move to another destination on the through rate from point of shipment to point of destination. The privilege is not open at Chicago or any Missouri River market. (4) A high percentage of the stock received at appellant's yard is sold there; this percentage has progressively increased. (5) Volume, appraised at $10 per car, applied to the 35,000 cars annually received at the yard.

None of these considerations has much, if any, bearing on the ascertainment of going value or the application of the rule that it is to be taken into account in confiscation cases. That element is not separate from or necessarily in excess of reasonable cost figures, attributable to the plant. The Secretary considered its location, the volume and flow of shipments, percentages of sales to receipts, privileges in transit, cost of service, past history, future prospects, and other pertinent facts. Appellant does not claim that its past operations clearly reflect excellence of service and low cost per unit in comparison with results attained by other stockyards, or that conditions affecting performance give dependable assurance of future growth and capacity to earn net returns at relatively low rates. See e. g. *McCardle* v. *Indianapolis Water Co., supra,* 413–415. Its evidence falls far short of condemning as arbitrary and confiscatory the Secre-

tary's refusal to add a separate amount to his rate base to cover going concern value.

*Yardage charges to traders.* These are prescribed as reasonable maximum rates to cover sales for which, as above stated, appellant has made no charge. Its failure so to do is found by the Secretary and the lower court to be unreasonably and unjustly discriminatory, in that it does make charges for similar privileges it furnishes producers and others selling in its market. The prescribed charges apply to animals sold by producers or others to traders and by the latter resold or reweighed for sale at the yard. On cattle, calves and hogs they are 50 per cent of those charged producers, on sheep and goats 40 per cent, and on horses, mules and pure-bred bulls, 100 per cent. The Secretary estimates that if appellant exacts the prescribed charges to traders it will obtain revenue from that source of $10,960 per year, and he includes that amount in his calculation of reasonable return.

There is controversy between the parties as to space assigned to traders and details of service attributable to sales by them. But the evidence clearly shows that, as found by the Secretary and lower courts, appellant does provide them facilities and privileges similar to, though not precisely the same as, those furnished to others making sales in the market. These charges are not discriminatory as between producers; they directly bear but one charge. Assuming that the charge for selling by traders would operate to lessen prices obtainable by producers from them, no unjust discrimination results, for obviously charges for the two sales of the same animals reasonably may be more than that exacted for the first one. These rates are prescribed, and revenues obtainable from them are included by the Secretary in his estimate of appellant's income, to the end that it may not exact from producers and others selling at the

yard charges sufficient to cover the part of its operating expenses that is fairly attributable to the sales made by traders. The statute denounces unjust discrimination and requires appellant as a public market to charge, and empowers the Secretary to prescribe, rates that are non-discriminatory. There is no ground for the appellant's suggestion to the effect that the order unlawfully invades its right as owner to manage the yard and control its business policy. Cf. *Interstate Commerce Comm'n* v. *Chicago G. W. Ry. Co.*, 209 U. S. 108, 118. *Norfolk & W. Ry. Co.* v. *West Virginia*, 236 U. S. 605, 609. *Northern Pacific Ry. Co.* v. *North Dakota*, 236 U. S. 585, 595, 596. *Banton* v. *Belt Line Ry.*, 268 U. S. 413, 421.

*Dues, donations and subscriptions.* Appellant claims an allowance in operating expenses of $3000 to $4000 a year. The Secretary found that it has regularly made disbursements ranging between those figures to local charities, philanthropies, civic organizations, etc.[5] He held that only those of peculiar benefit to respondent's employees and patrons should be included, and on that basis allowed in estimated future operating expenses $325 a year. Appellant says that the exclusion leaves return about $1000 short of six and one-half per cent, that no contributions were made to charities which did not carry

---

[5] There were over one hundred recipients of dues, donations and subscriptions during the five years ending with 1934. The contributions made in 1934 are fairly illustrative. They are listed below. Those in italics were made (in varying amounts) in each of the five years; those underscored were allowed by the Secretary.

*Denver Community Chest*, $1000; *Denver Chamber of Commerce*, $240; *U. S. Chamber of Commerce*, $50; Junior Chamber of Commerce, $15; *Tickets and Boxes—Stock Show*, $395.50; American Stockyards Association, $832.56; *Church Donations*, $115; Flowers, $4; United Appeal, $75; *Volunteers of America*, $10; Veteran Volunteer Firemen, $5; Firemen's Protective Association, $15; *Denver Traffic Club*, $18; *Denver Commercial Traffic Club*, $18; I. C. C. Traffic Reports, $25.25; Traffic Service Corp., $10; Brand Inspectors—Christmas, $70; *Denver Live Stock Exchange*, $95.53; Denver Post, $12;

on in the stockyards area, and that nearly all other items were business expenses.

But decision here cannot be made to turn on an estimated margin relatively so small. Appellant's annual receipts and sales at the yard vary considerably. Operating expenses may be less or more per head than the estimates therefor. Property value may decline or advance. None of the expenditures in question is compulsory. Appellant may withhold dues, donations or subscriptions as it sees fit. It was not, and probably could not have been, proved that failure to respond would adversely affect its revenue. The Secretary is not required to prescribe rates so low as to be barely sufficient to withstand attack on the ground of confiscation, but is at liberty within limits that he may find to be just and reasonable to establish higher rates. *Banton* v. *Belt Line Ry., supra,* 422. *Dayton P. & L. Co.* v. *Comm'n, supra,* 308. *Columbus Gas Co.* v. *Comm'n,* 292 U. S. 398, 414. *Atlantic Coast Line* v. *Florida,* 295 U. S. 301, 317. Cf. *Dayton-Goose Creek Ry.* v. *United States,* 263 U. S. 456, 484. In view of the variable elements to which appellant's prospective income is subject, its control over the items in controversy, and their triviality, we find it unnecessary to decide whether appellant as of constitutional right is entitled to have any of them included in its future operating expenses.

---

Tax Payers Review, $5; Policemen's Protective Association, $50; Lunches at Auction, $55; 4–H Club Luncheon, $34; Traffic Red Book, $8; Old Folks Home, $10; Christmas Seals, $1; Rescue Mission, $2.50; Chicago Drovers Journal Yearbook, $1; Church Messenger, $11; Joint Labor Day Committee, $10; Denver Tourists Bureau, $100; Wedding Gift, $250; Gents Driving & Riding Club, $10; Colorado Womens College, $100; International Vet. Congress, $25; Police & Sheriffs Association, $25; Federal Income Tax Service, $66; Western Legionnaire, $5; National Federation of Federal Employees, $11; American Legion, $5; Program—Holy Name Basket Ball, $5; Office Employees Hay Ride, etc., $3; Guldman Community Center, $2.50; President's Ball—Tickets, $18.

*Expenses of hearings under the Act.* The Secretary found it reasonable to include in estimated operating costs some of the expenses incident to future hearings under the Act, suggested that they will be less than heretofore, and allowed $100 a month. The court below reached the same conclusion. Appellant does not attack this allowance as insufficient to cover expense on account of future hearings. Here, it complains that nothing is included "to amortize over a reasonable future period or at all the costs and expenses of the present litigation."

But we are not called on to decide that question. Appellant's bill challenges the Secretary's allowance, refers to expenses theretofore incurred in rate investigations and alleges that the allowance "is wholly inadequate to permit petitioner [appellant] either to reimburse itself for expenditures forced upon it by the Secretary or to meet probable reasonable expenditures for said purposes in the future, and that the . . . finding . . . is arbitrary . . ." At the trial the Secretary, without conceding materiality of the facts, stipulated that expense of the present proceeding from its commencement, about January 1, 1935, to the date of the order was $24,654.27 and that a reasonable estimate of the expense of litigation in the lower court was $15,785. Appellant requested the court to find that its average annual expense on account of hearings under the Act for the five-year period ending with 1934 was $8,786.88, and to find the facts stipulated by the Secretary and that its average annual expense on account of enforcement of the Act for the eleven-year period ending with 1934 was $6,216.

The burden was on appellant by direct allegations plainly to set forth the facts on which it intended at the trial to maintain that the rates are confiscatory. *Aetna Insurance Co.* v. *Hyde,* 275 U. S. 440, 447, and cases there cited. *New Orleans Public Service* v. *New Orleans,* 281 U. S. 682, 686. *Beaumont, S. L. & W. Ry. Co.* v. *United*

*States,* 282 U. S. 74, 88–89. *Missouri Pacific R. Co.* v. *Norwood,* 283 U. S. 249, 255. Its complaint failed to disclose the claim it now makes. It is that for each of the five years following the effective date of the order, there should be added to estimated cost of operation about $8,000 to cover expenses of hearings before the Secretary and of litigation in the district court. Its request for finding was not sufficient to present the question. Probable expense of future hearings being in issue, the Secretary's stipulation as to actual cost of past hearings and probable expense of future litigation cannot be regarded as consent to litigate the question of amortization not raised by the bill. As the issue was not appropriately presented below, appellant is not entitled to have it decided here.

*Rate of return.* Upon consideration of the testimony of the Secretary's economist and a local investment banker of high standing, who is also a stockholder and director of appellant, the Secretary and lower court found that six and one-half per cent per annum of the value of the property is a reasonable return. We need not restate the considerations to be taken into account in determining a reasonable rate of return.[6] Plainly the evidence is not sufficient to require or warrant a finding that in the immediate future a return of six and one-half per cent on the value of the property will be confiscatory.

The judgment of the District Court must be

*Affirmed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.

MR. JUSTICE BLACK concurs in the result.

---

[6] *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19. *Bluefield Co.* v. *Public Service Comm'n,* 262 U. S. 679, 692. *Lindheimer* v. *Illinois Tel. Co.,* 292 U. S. 151. *Dayton P. & L. Co.* v. *Comm'n,* 292 U. S. 290, 311. *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 72.