**MIDWESTERN GAS TRANSMISSION COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 18606.

United States Court of Appeals Fifth Circuit.

June 30, 1961.

Harry S. Littman, Jack Werner, Harold L. Talisman, Dale A. Wright, Washington, D. C., W. C. Braden, Jr., Houston, Tex., for petitioner.

John C. Mason, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, Peter H. Schiff, Atty., Robert L. Russell, Asst. Gen. Counsel, Federal Power Commission, Washington, D. C., for respondent.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JONES, Circuit Judge.

Midwestern Gas Transmission Company brings before us for review and seeks to set aside an order of the Federal Power Commission. A recital of some of the facts is required in order to present the issues. Midwestern was granted a certificate in May, 1959, for the construction of a gas transmission system, referred to as its Southern System, extending from Portland, Tennessee, to Joliet, Illinois. In April of 1959, Midwestern had made application to the Commission for authority to construct and operate a pipe line, to be known as its Northern System, for the transmission of natural gas from Manitoba, Canada, to the designated location in Wisconsin and there to connect with the facilities of its principal distributor. The application also sought authority to import up to 204,000 Mcf of natural gas per day from Canada. A hearing was had and testimony was taken, including the testimony of Midwestern's Board Chairman who expressed the opinion that a 7 per cent. rate of return for 1963, the third full year of operation, would be required in order to finance the project. No independent financial expert then testified and no evidence was produced as to the earnings of other similar companies.

The Commission authorized the construction of the line and the importation of gas in October 1959. In its order the Commission stated that Midwestern's plans for financing and its proposed rates from sales were based upon a 7 per cent. rate of return to be achieved in 1963, the third full year of operation. It was also

set forth that the Commission's staff regarded a 7 per cent. rate as excessive. The Commission noted that a return of 6¼ per cent. had been permitted for the Southern System and indicated its intention not to provide for a lower rate of return for the Northern System. A comment was made about the uncertainty of the cost of money and the difficulty of predicting the rate of return that would be regarded. Following this predicate, the order provided,

> "We shall, therefore, require Midwestern to file with the Commission, prior to commencing construction, the firm proposals for financing as finally consummated and we shall at that time fix a rate of return. Thereafter, and no later than 60 days prior to the commencement of service, Midwestern shall file rate schedules satisfactory to the Commission covering the sales authorized herein, which rate schedules shall be accompanied by cost of service data showing the derivation of the specific rates, and which take into consideration, among other things, the resultant cost of financing to Midwestern."

Thus at the outset the 7 per cent. rate of return was questioned, the determination of a fair rate of return was reserved and deferred, and it was plainly stated that rate schedules would have to be satisfactory to the Commission.

On December 9, 1959, Midwestern submitted its proposed plan of financing to the Commission. In the letter by which the plan was sent to the Commission, Midwestern made reference to the Commission's opinion and order and advised the Commission that neither Midwestern nor its underwriters requested that there be a finding of a rate of return at that time since the contracts with distributors would not produce an adequate return and an additional rate filing in two years was required by the underwriters. The Commission approved the plan with the comment that the Commission was expressing no opinion on the subject of rate of return. The construction of the transmission line of Midwestern's

Northern System was commenced on May 28, 1960. On July 1, 1960, Midwestern tendered rate schedules for filing which were substantially the same as the rates previously proposed and which were intended to produce a return of 7 per cent. during the third full year of operation. The Commission rejected the rate schedules and made a determination that 6½ per cent. was a proper rate of return. A rehearing was sought and denied. By a petition for review we are asked to set aside the order. It is contended by Midwestern that the initial rates for the first two years are arbitrary, unreasonable and capricious, the Commission's order is not supported by essential findings or substantial evidence, and that the Commission abused its discretion in rejecting the proposed rates after previously approving the financing plan based upon such rates.

Midwestern contends that the rates based upon the 6½ per cent. rate of return for the third year of operation would yield only 4.9 per cent. during the first year and 6.07 per cent. during the second year of operation. Such yields, it urges, are confiscatory, arbitrary, unreasonable, and violative of due process. During the first two years it was expected that considerably less gas would be purchased, transmitted and sold by Midwestern than during the third and succeeding years. It did not expect and was not entitled to expect that it would be permitted, during the development period, to charge rates that would produce revenue of an amount equal, or even comparable, to that which it would be entitled to receive when the full capacity of operations had been attained. Midwestern is not entitled to the return for the lesser volume of business during the development years that it will become entitled to receive during the post-development period from the larger volume. It is the rule that rates are to yield a reasonable rate of return upon the value of the property used, at the time of its being used, to render the service. Denver Union Stock Yard Co. v. United States, 304 U.S. 470, 58 S.Ct. 990, 82 L.

Ed. 1469; Minnesota Rate Cases (Simpson v. Shepard) 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18. The rule is applicable where the plant facilities are operating at less than capacity. San Diego Land & Town Company v. Jasper, 189 U.S. 439, 23 S.Ct. 571, 47 L.Ed. 892. Such is the case here as to the first two years.

 The third year of operation was a proper year upon which to base a rate of return for rate-fixing purposes. It would be the first full year of normal operations. The use of an earlier year as a test year would have produced a rate which would have resulted in an excessive cost to the consumer whose protection, after all, is the primary aim of the Natural Gas Act, 15 U.S.C.A. § 717 et seq. Federal Power Commission v. Transcontinental Gas Pipe Line Corporation, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377; Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623. Midwestern, in its application for rehearing filed with the Commission on September 1, 1960, stated that it was then operating at a deficit. In 1961 the anticipated yield will exceed interest requirements to some extent and in 1962 there will be even more earnings available for allocation to equity capital. We are not persuaded by Midwestern's plea that the Commission has dealt unfairly with it.

Midwestern complains that it submitted to the Commission and the Commission approved a plan of financing which contemplated a rate of return of 7 per cent. But at the outset the Commission gave warning that it was not approving a 7 per cent. rate of return and raised a doubt that such a rate of return would be approved. That the rate of return for the first two years of operation was not required in the procurement of financing and is not required to support financial commitments is indicated by Midwestern's evidence. If doubt existed, we think it would be removed by the statement, accompanying the request for approval of the financing plan, that neither Midwestern nor its underwriters then requested a finding as to a rate of return. In this light we cannot see how it can be said that the financing program was either conditioned or dependent upon a 7 per cent. rate of return.

 It is our conclusion that the Commission's order is supported by the evidence before it, and that its requiring rates based upon a 6½ per cent. rate of return for the third year of operation is reasonable and proper and is not arbitrary, capricious, confiscatory or violative of Midwestern's rights to due process.

The Commission's order is free from error and is

Affirmed.

JOHN R. BROWN, Circuit Judge (concurring specially).

I concur in the result and all of the opinion save one phrase. It is accurate to state that it has been several times said in the cited cases that the primary aim of the Natural Gas Act was to protect the consumer. But the Act does not say so. I still believe that Congress was equally concerned with the rights, the ownership and the imperative requirement for fairness due those who own this valuable natural resource, those whose ingenuity and risktaking captures it for man's productive use, and those who transport it from the wellhead to the burner tip. Perhaps their interests are assumed in the objective of protecting that of the consumer. If that is so the phrase is meaningless. If it means more, then it sounds its own death knell so long as the Fifth Amendment stands to keep government from taking one's goods for the benefit of another.