# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 26 2019, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT
INDIANA OFFICE OF UTILITY
CONSUMER COUNSELOR

William I. Fine
Daniel M. LeVay
Scott C. Franson
Indiana Office of Utility Consumer
Counselor
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT
CITY OF CROWN POINT, INDIANA

Robert M. Glennon
Robert Glennon & Assoc., P.C.
Danville, Indiana

Jeffery A. Earl
Danville, Indiana

ATTORNEYS FOR APPELLANT
TOWN OF SCHERERVILLE, INDIANA

J. Christopher Janak
Kristina Kern Wheeler
Bose, McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA-AMERICAN WATER
COMPANY

David L. Pippen
General Counsel
Indiana-American Water Company
Greenwood, Indiana

Peter J. Rusthoven
Nicholas K. Kile
Hillary J. Close
Barnes & Thornburg, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
CITY OF LAKE STATION

Michael L. Deppe
Benjamin D. Waite
Deppe Law Center
Hobart, Indiana

ATTORNEYS FOR APPELLEE
INDIANA UTILITY REGULATORY
COMMISSION

Curtis T. Hill, Jr.
Attorney General of Indiana

Patricia C. McMath
Aaron T. Craft
Deputy Attorneys General
Indianapolis, Indiana

Beth E. Heline
General Counsel
Jeremy Comeau
Steven Davies
Assistant General Counsel
Indiana Utility Regulatory
Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Indiana Office of Utility Consumer Counselor, City of Crown Point, Indiana, and Town of Schererville, Indiana, | June 26, 2019 |
| | Court of Appeals Case No. 18A-EX-2179 |
| *Appellants-Statutory Party and Intervenors,* | Appeal from the Indiana Utility Regulatory Commission |
| v. | The Honorable James F. Huston, Chairman |
| Indiana-American Water Company, Inc., City of Lake Station, Indiana, and Indiana Utility Regulatory Commission, | The Honorable Sarah E. Freeman, Stefanie Krevda, David Ober, and David E. Ziegner, Commissioners |
| *Appellees-Petitioners and Administrative Agency* | The Honorable Carol Sparks Drake, Administrative Law Judge |
| | IURC Cause No. 45041 |

**Crone, Judge.**

# Case Summary

Indiana-American Water Company, Inc. ("Indiana American"),[1] agreed to purchase the water utility of the City of Lake Station ("Lake Station") for over $20,000,000. Indiana American and Lake Station filed a petition seeking approval of the proposed sale from the Indiana Utility Regulatory Commission ("the Commission"). After an evidentiary hearing on the petition, the Commission issued an order approving the transaction over the objection of the Indiana Office of Utility Consumer Counselor ("the OUCC") and Indiana American wholesale customers the Town of Schererville ("Schererville") and the City of Crown Point ("Crown Point") (collectively "Appellants").

On appeal, the controversy centers on Lake Station's water treatment plant and five supply wells, which Lake Station currently uses. Although Indiana American does not plan to use them after the transaction closes, the Commission allowed their appraised value of over $7,000,000 to be included in Indiana American's rate base. Appellants argue that the Commission erred in doing so. The Commission, Indiana American, and Lake Station (collectively "Appellees") argue otherwise. We agree with Appellees and therefore affirm.

---

[1] We follow the Indiana Utility Regulatory Commission's lead in dropping the hyphen from the company's name.

## Facts and Procedural History[2]

The relevant facts are undisputed. Lake Station's water system has been interconnected with Indiana American's Northwest Operations System since 1965.[3] In 1990, Lake Station and Indiana American entered into a water supply agreement, which allowed Lake Station to receive 750,000 gallons per day. At the recommendation of an engineering consultant, Lake Station constructed various improvements to its water system, including five new supply wells and a water treatment plant, which began operating in 2015. That same year, the water supply agreement between Lake Station and Indiana American expired and was not renewed, resulting in the closure of the valves linking the two systems.

Lake Station was unable to adequately maintain its water system, so in March 2016 it started taking steps to sell the system pursuant to Indiana Code Chapters 8-1.5-2 ("Transfer, Acquisition, and Improvement of Utilities by Municipalities") and 8-1-30.3 ("Acquisition of Distressed Water or Wastewater Utilities"). Before a municipal legislative body or executive may sell its "nonsurplus municipally owned utility property," it must appoint three disinterested Indiana residents to appraise the property. Ind. Code § 8-1.5-2-4.

---

[2] We thank the parties for their well-written briefs, which facilitated our review.

[3] According to the Commission's order, Indiana American "is an Indiana corporation engaged in providing water utility service to the public in numerous communities throughout Indiana, including Lake County, for residential, commercial, industrial, public authority, sale for resale, and fire protection purposes[,]" and "serves approximately 300,000 water customers …." Appealed Order at 2. Lake Station "owns and operates a water system serving approximately 3,443 metered customers." *Id.*

If the legislative body and the municipal executive decide to proceed with the sale after the appraisal is returned, the legislative body must hold a public hearing and then may adopt an ordinance providing for the sale of the property. Ind. Code § 8-1.5-2-5(d).

[5] Lake Station appointed three appraisers, who returned an appraisal that valued its nonsurplus water utility property at $20,380,600. Lake Station held a public hearing and in June 2017 adopted an ordinance for the sale of the property. In September 2017, Lake Station and Indiana American signed an asset purchase agreement, pursuant to which Indiana American proposed to pay Lake Station $20,680,000 for the property.

[6] Before a municipality may sell its nonsurplus utility property, the municipality and the prospective purchaser must obtain the Commission's approval pursuant to Indiana Code Section 8-1.5-2-6.1 ("Section 6.1"). Ind. Code § 8-1.5-2-6.1(b). The Commission shall approve the sale according to the parties' proposed terms and conditions if the Commission finds that the sale according to those terms and conditions is in the public interest. Ind. Code § 8-1.5-2-6.1(d). The purchase price shall be considered reasonable if it does not exceed the appraised value set forth in the aforementioned appraisal. *Id*. If a municipally owned utility files a petition under Indiana Code Section 8-1-30.3-5(d) and the Commission approves the petition under Indiana Code Section 8-1-30.3-5(c), then the proposed sale "is considered to be in the public interest." Ind. Code § 8-1.5-2-6.1(e)(1).

In January 2018, Indiana Code Section 8-1-30.3-5 ("Section 30.3-5") provided in relevant part as follows:

> (a) This section applies if:
>
>> (1) a utility company acquires property from another utility company at a cost differential[4] in a transaction involving a willing buyer and a willing seller; and
>>
>> (2) at least one (1) utility company described in subdivision (1) is subject to the jurisdiction of the commission under this article.
>
> (b) There is a rebuttable presumption that a cost differential is reasonable.
>
> (c) The utility company that acquires the utility property may petition the commission to include the cost differentials as part of its rate base. The commission shall approve the petition if the commission finds the following:
>
>> (1) *The utility property **is used and useful** in providing water service, wastewater service, or both water and wastewater service.*
>>
>> (2) The distressed utility failed to furnish or maintain adequate, efficient, safe, and reasonable service and

---

[4] *See* Ind. Code § 8-1-30.3-1 ("As used in this chapter, 'cost differential' means the difference between: (1) the cost to a utility company that acquires utility property from a distressed utility, including the purchase price, incidental expenses, and other costs of acquisition; minus (2) the difference between: (A) the cost of the utility property when originally put into service by the distressed utility; minus (B) contributions or advances in aid of construction plus applicable accrued depreciation."). According to the Commission, "[t]he cost differential is in essence the 'premium' paid over and above the original cost less depreciation, which would have otherwise been allowed in rate base." Commission's Br. at 25.

facilities.[5]

(3) The utility company will make reasonable and prudent improvements to ensure that customers of the distressed utility will receive adequate, efficient, safe, and reasonable service.

(4) The acquisition of the utility property is the result of a mutual agreement made at arms length.

(5) The actual purchase price of the utility property is reasonable.

(6) The utility company and the distressed utility are not affiliated and share no ownership interests.

(7) The rates charged by the utility company before acquiring the utility property of the distressed utility will not increase unreasonably as a result of acquiring the utility property.

(8) The cost differential will be added to the utility company's rate base to be amortized as an addition to

---

[5] *See* Ind. Code § 8-1-30.3-2 ("As used in this chapter, 'distressed utility' refers to a utility company whose property is the subject of an acquisition described in section 5(a) of this chapter."). Indiana Code Section 8-1-30.3-6 provides in pertinent part that for purposes of Section 30.3-5(c)(2),

> a distressed utility is not furnishing or maintaining adequate, efficient, safe, and reasonable service and facilities if the commission finds one (1) or more of the following:
>
> …
>
> (5) The distressed utility:
>
>> (A) is municipally owned utility property of a municipally owned utility that serves fewer than five thousand (5,000) customers; and
>>
>> (B) is being sold under IC 8-1.5-2-6.1.

expense over a reasonable time with corresponding reductions in the rate base.

(d) A utility company may petition the commission in an independent proceeding to approve a petition under subsection (c) before the utility company acquires the utility property if the utility company provides:

(1) notice of the proposed acquisition and any changes in rates or charges to customers of the distressed utility;

(2) notice to customers of the utility company if the proposed acquisition will increase the company's rates by an amount that is greater than one percent (1%) of the utility company's base annual revenue;

(3) notice to the office of the utility consumer counselor; and

(4) a plan for reasonable and prudent improvements to provide adequate, efficient, safe, and reasonable service to customers of the distressed utility.

(Emphasis added.)

In January 2018, Indiana American filed a petition with the Commission pursuant to Section 30.3-5 seeking approval to include cost differentials as part of its rate base. Lake Station joined the petition, seeking approval to sell its assets pursuant to Section 6.1. Indiana American wholesale customers Schererville and Crown Point were granted permission to intervene. The Commission held an evidentiary hearing at which the foregoing entities and the

OUCC appeared.[6] In August 2018, a majority of the five-member Commission issued an order finding that Lake Station's water utility is a distressed utility under Indiana Code Section 8-1-30.3-6(5), that the sale is in the public interest pursuant to Section 6.1, and that Indiana American had satisfied the requirements of Section 30.3-5(c) and -(d). With respect to Section 30.3-5(c)(1), which is the focus of this appeal, the majority's findings state in pertinent part:

> **(1) The utility property is used and useful in providing water service, wastewater service, or both water and wastewater service.** This element was contested as it relates to the used and useful status of Lake Station's treatment plant [("WTP")], wells, and associated equipment[, which had been valued at approximately $7,366,043]. The crux of this dispute is whether this requirement is satisfied if the utility property is used and useful to the seller or if it must also be used and useful to the acquiring utility. [OUCC Utility Analyst James Parks] testified that the Lake Station WTP will not be used and useful after Lake Station's Water System is acquired by Indiana American. [Indiana American Director of Community and Government Affairs Matthew Prine] testified that the Lake Station plant "is" used and useful as it is currently supplying water to Lake Station customers today. ….
>
> ….
>
> In approaching this element, it is important to recognize that it is likely this transaction would not be before the Commission if the Lake Station source of supply and treatment plant were excluded from the acquisition. [Lake Station Mayor Christopher

---

[6] Indiana Code Section 8-1-1.1-4.1(a) provides that the OUCC "may appear on behalf of ratepayers, consumers, and the public" in hearings before and appeals from the orders of the Commission.

Anderson] testified that Lake Station still owes money to the State of Indiana related to the construction of the treatment plant. He also testified that Lake Station could not sell its system without also selling the WTP because revenues from water sales would be needed to pay back the loan.

Indiana American argues that the verb tense (present and not future) used in Section 30.3-5(c)(l) requires us to find that the utility property it is seeking to acquire "is" used and useful by Lake Station in the provision of water service as opposed to finding that it "will be" used and useful to Indiana American after the acquisition. We agree and find that it is sufficient for the purposes of this statute that the utility property is used and useful to the selling utility.

In addition to the plain language of the statute, the use of the present tense makes sense in the overall statutory scheme. If a purchaser was required to show that all of the assets being acquired would continue to remain reasonably in service after the closing, there may be anomalous results that could discourage the purchase of distressed utilities and its promotion of efficiencies through regionalization. The clear policy decision of the legislature to encourage regionalization through acquisitions further supports finding that the utility property is used and useful to the selling utility.[7]

For example, as further discussed below, Section 6.1 requires the Commission to find the purchase price for a municipality's nonsurplus property to be reasonable if it does not exceed its appraised value. Consequently, if Lake Station had received two offers for the purchase of its utility at the appraised value, one from a utility that had an existing interconnection and need only

[7] A detailed description of recent legislative activity in this area appears on pages 20 and 21 of the Commission's order.

open a valve to deliver quality water from an existing regional treatment plant and the other from a utility that would need to operate Lake Station's existing WTP and wells, it seems unreasonable to allow the cost differential in the rate base of the utility needing to continue operation of the existing WTP and wells, but not for the utility that simply needs to open the interconnection and may be able to provide more efficient service with its existing facilities. Changing the verb tense to future tense would require that every single asset owned by the seller remain in service, despite the efficiencies, economies, and improvements to service that might be gained by the combination. It may also cause sellers not to choose the purchaser in the best position to regionalize and gain service efficiencies in order to sell to another purchaser for a higher price.

Our dissenting colleagues argue that under Ind. Code § 8-1-2-6,[8] to be part of a public utility's rate base, an asset must be used and useful to that utility and therefore, Indiana American is prohibited from including in rate base the cost of Lake Station's WTP and wells. However, we must respectfully disagree. As specific exceptions to Ind. Code § 8-1-2-6, Sections 6.1 and 30.3-5 were clearly intended by the legislature to change the standards of Ind. Code § 8-1-2-6 in certain circumstances, in order to promote the regionalization and greater efficiencies through the acquisition of distressed utilities and small municipal utilities. In addition, the legal case history regarding "used and useful" involved instances in which cost recovery was being sought for cancelled electric generation plants. *See Citizens Action Coalition, Inc. v. N. Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 614-615 (Ind. 1985).

---

[8] Indiana Code Section 8-1-2-6 reads in pertinent part as follows:

(a) The commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value, giving such consideration as it deems appropriate in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section. As one of the elements in such valuation the commission shall give weight to the reasonable cost of bringing the property to its then state of efficiency. In making such valuation, the commission may avail itself of any information in possession of the department of local government finance or of any local authorities. The commission may accept any valuation of the physical property made by the interstate commerce commission of any public utility subject to the provisions of this act.

(b) The lands of such public utility shall not be valued at a greater amount than the assessed value of said lands exclusive of improvements as valued for taxation. In making such valuation no account shall be taken of presumptive value resting on natural resources independent of any structures in relation thereto, the natural resource itself shall be viewed as the public's property. No account shall be taken of good will for presumptive values growing out of the operation of any utility as a going concern, all such values to rest with the municipality by reason of the special and exclusive grants given such utility enterprises. Except in a proceeding under IC 8-1-30, *and except as provided in IC 8-1-30.3-5 and IC 8-1.5-2-6.1*, no account shall be taken of construction costs unless such costs were actually incurred and paid as part of the cost entering into the construction of the utility. Except in a proceeding under IC 8-1-30, *and except as provided in IC 8-1-30.3-5 and IC 8-1.5-2-6.1*, all public utility valuations shall be based upon tangible property, that is, such property as has value by reason of construction costs, either in materials purchased or in assembling of materials into structures by the labor or (of) workers and the services of superintendents, including engineers, legal and court costs, accounting systems and transportation costs, and also including insurance and interest charges on capital accounts during the construction period. As an element in determining value the commission may also take into account reproduction costs at current prices, less depreciation, based on the items set forth in the last sentence hereof and shall not include good will, going value, or natural resources.

(Emphases added.)

In contrast, Indiana American provided testimony that it would be using Lake Station's existing WTP and wells to some extent, such as in cases of emergency and to backup Indiana American's existing system, particularly to assist with threats to its water supplies. We also recognize that Indiana American is not purchasing or building a treatment plant and wells; it is proposing to regionalize and purchase an entire system, which includes a treatment plant and wells, and all of which is included in the appraisal price. Moreover, Ind. Code § 8-1-2-6 is a statute of general applicability for use when reviewing utility rates and charges; whereas Sections 6.1 and 30.3-5 are more specific statutes addressing what may be included in the rate base of a utility that is acquiring a distressed utility. Indiana courts have held "where provisions of a statute conflict, the specific provision takes priority over the general provision." *Robinson v. Wroblewski*, 704 N.E.2d 467, 475 (Ind. 1998). Therefore, because Section 30.3-5(c)(l) does not require a utility to demonstrate that the acquired assets will be used and useful, Ind. Code § 8-1-2-6 does not prohibit Indiana American from including in rate base that which is authorized under Sections 6.1 and 30.3-5.

We also respectfully disagree with the OUCC and our dissenting colleagues that Section 30.3-5(c) applies to an acquisition that has already occurred. They base their interpretation on the fact that this provision states that the utility company that "acquires" the utility property may petition the Commission to include the cost differentials as part of its rate base. However, if you read Sections 6.1 and 30.3-5 as a whole, the review that occurs under Section 30.3-5(c) must occur *prior* to the close of the acquisition. *See*, Ind. Code 8-1-30.3-5(d) providing that a "utility company may petition the commission in an independent proceeding to approve a petition under [Section 30.3-5(c)] *before* the utility company acquires the utility property…" (emphasis added); Ind. Code § 8-1.5-2-6.l(b) requires the municipality and the prospective purchaser to obtain Commission approval "*[b]efore* a municipality may proceed to sell" its property (emphasis added); and Ind. Code § 8-1.5-2-6.1(e) requiring the Commission to

> approve the *proposed* sale as within the public interest if the municipality's municipally owned utility petitions the Commission under Section 30.3-5(d) and the Commission approves that petition under Section 30.3-5(c).
>
> The statute requires that the utility property before the acquisition "is used and useful" and does not address what its use will be after the closing. There is no dispute that the Lake Station WTP and wells, as they exist today, are currently used and useful, and we so find.

*Id.* at 25-28 (footnotes omitted) (underlined emphasis replaced with bold type).[9] Accordingly, the majority approved "the acquisition of the Lake Station Water System by Indiana American on the terms described in the Asset Purchase Agreement" and allowed Indiana American to "record for ratemaking purposes as net original cost rate base of the assets being acquired an amount equal to

---

[9] In a subsequent portion of the order, the majority stated,

> The most disputed issue raised in this case was whether particular Lake Station Water System assets, i.e., the WTP and wells, should be considered reasonably necessary to the provision of utility service by Indiana American and therefore "used and useful" following the closing of the sale. We have determined and found that the WTP and wells are used and useful now to Lake Station and for acquisition purposes. This is why we approve the purchase. However, testimony has been presented that these assets might not be used and useful following the acquisition. If it does in fact turn out that the WTP and wells are not used and useful to Indiana American following the acquisition, we encourage Indiana American to voluntarily explore ratemaking options that might mitigate the impact of the purchase price in future proceedings. For example, the purchase price associated with the WTP and wells could be treated in a way that provides for a return of the investment, but does so at a reduced return on the investment. Another option may be to undertake an analysis to determine the ongoing value of the WTP and wells in providing water service to the consolidated customers and to compare that value against that of continuing to operate and maintain those assets. We encourage Indiana American and other utilities serving the public in Indiana to voluntarily use their resources and explore reasonable financial concessions that can serve to enhance regionalization efforts in a manner that also fosters positive public sentiments regarding those efforts for the benefit of all Hoosiers.

Appealed Order at 32.

$20,199,470, plus actual incidental expenses, and other costs of acquisition reasonably incurred ….” *Id.* at 33.[10] The remaining Commission members issued a dissenting opinion. This appeal ensued.

## Discussion and Decision

The legislature created the Commission primarily as a factfinding body with the technical expertise to administer the regulatory scheme that the legislature devised. *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). “When exercising this authority, the Commission balances the public’s need for adequate, efficient, and reasonable service with the public utility’s need for sufficient revenue to meet the cost of furnishing service and to earn a reasonable profit.” *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 100 N.E.3d 234, 238 (Ind. 2018). The Indiana Code authorizes judicial review of Commission orders, which “must contain specific findings on all the factual determinations material to its ultimate conclusions[,]” and those findings “must be supported by substantial evidence in the record.” *Ind. Gas Co. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 66 (Ind. 2013).

Appellants do not challenge the correctness of the Commission’s factual findings, but they do disagree with the Commission’s interpretation of Section 30.3-5(c)(1). We ordinarily review an agency’s legal conclusions de novo.

---

[10] Sections 6.1(f) and 30.3-5(e) both authorize the purchasing entity to record “(1) the full purchase price; (2) incidental expenses; and (3) other costs of acquisition” as the net original cost rate base.

*Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 619 (Ind. 2019). Our supreme court recently explained that although we are not bound by such conclusions, an interpretation of a statute by an agency charged with the duty of enforcing it "is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." *Id*. (quoting *Chrysler Grp., LLC v. Review Bd. of Ind. Dep't of Workforce Dev.*, 960 N.E.2d 118, 123 (Ind. 2012)).[11] "In fact, 'if the agency's interpretation is reasonable, we stop our analysis and need not move forward with any other proposed interpretation.'" *Id*. (quoting *Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016)). Simply stated, the question before us is whether the Commission's interpretation of Section 30.3-5(c)(1) is reasonable. We hold that it is.

[11] Appellants' primary complaint is that under longstanding Commission and court precedent, the "used and useful" standard has "applied to the utility seeking to recover a return on and a return of the utility property in question." Appellants' Br. at 23. But Appellants do not specifically assert, let alone conclusively establish, that this administrative and judicial precedent somehow precludes the legislature from applying the standard to a distressed utility

---

[11] The court took a contrary position less than six months earlier in *NIPSCO Industrial Group v. Northern Indiana Public Service Co.*, 100 N.E.3d 234, 241 (Ind. 2018) ("We review questions of law de novo … and accord the administrative tribunal below no deference."), but we are bound by its latest pronouncement on the subject. *Correll v. State*, 639 N.E.2d 677, 683 (Ind. Ct. App. 1994).

seeking to sell its nonsurplus property.[12]  It was reasonable for the Commission to conclude that, pursuant to Section 30.3-5(c)(1), the legislature intended for the standard to apply to the seller of a distressed utility for the multiple cogent reasons stated in its order, which we need not rehash here.[13]  Appellants (and Indiana American's ratepayers) may disagree with the legislature's policy preferences regarding regionalization and the acquisition of distressed utilities, but it is not our prerogative to second-guess those preferences or their

---

[12] Lake Station points out that determining whether "an asset 'is used and useful' to the seller ensures that the seller is only selling nonsurplus property as required by [Section 6.1(b)]."  Lake Station's Br. at 21.  The Commission makes the same observation and further observes that "exactly none of Lake Station's nonsurplus utility property is used and useful to Indiana American because it owns none of the property."  Commission's Br. at 34.  In a recent opinion, another panel of this Court concluded that Sections 6.1 and 30.3-5 "apply to the same subject matter and must be construed harmoniously[,]" just as the Commission did in its order in this case.  *NOW!, Inc. v. Indiana-American Water Co.*, 117 N.E.3d 647, 657 (Ind. Ct. App. 2018), *trans. denied* (2019).  Contrary to Appellants' assertion in their reply brief, *NOW!, Inc.* is (and always has been) a published opinion, which was certified on May 14 following our supreme court's denial of transfer.

[13] The legislature's recent amendment of Section 30.3-5(c)(1) (now codified as Section 30.3-5(d)(1)) clarifies this intent.  *See* Ind. Pub. Law 229-2019 § 5 ("Before closing on the acquisition, the utility company that acquires the utility property may petition the commission to include any cost differential as part of its rate base in future rate cases.  The commission shall approve the petition if the commission finds the following: (1) The utility property is *used and useful to the offered* [i.e., distressed] *utility* in providing water service, wastewater service, or both water and wastewater service.") (emphases added).

outcomes.[14]  Consequently, we stop our analysis without considering Appellants' interpretation of Section 30.3-5(c)(1) and affirm the Commission's order.

Affirmed.

Vaidik, C.J., and Mathias, J., concur.

---

[14] Appellants quote Indiana Code Section 8-1-2-0.5, which provides,

> The general assembly declares that it is the continuing policy of the state, in cooperation with local governments and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to create and maintain conditions under which utilities plan for and invest in infrastructure necessary for operation and maintenance while protecting the affordability of utility services for present and future generations of Indiana citizens.

Appellants then assert,

> Requiring customers to pay for the return on and return of Indiana American's investment in a water treatment plant that is not used and useful to Indiana American is not consistent with the legislative policy of being "necessary for operation" of Indiana American and is not "protecting the affordability of utility services for present and future generations of Indiana citizens.

Appellants' Br. at 33.  We note that Section 30.3-5 was enacted before Section 8-1-2-0.5, and we presume that the legislature was aware of the former when it drafted the latter.  Any real or perceived dissonance between the two is not a matter of judicial concern.  In their reply brief, Appellants raise what could be construed as a substantive due process challenge to the Commission's interpretation of Section 30.3-5(c)(1), *see* Appellants' Reply Br. at 10-11 (quoting *Denver Union Stock Yard Co. v. United States*, 304 U.S. 470, 475 (1938)), but an argument raised for the first time in a reply brief is waived.  *Showley v. Kelsey*, 991 N.E.2d 1017, 1021 n.2 (Ind. Ct. App. 2013), *trans. denied*.