The **TRAVELERS INSURANCE COM-PANY, a corporation, Plaintiff,**

v.

**BLUE CROSS OF WESTERN PENN-SYLVANIA, a corporation, Defendant.**

Civ. No. 68-89.

United States District Court, W. D. Pennsylvania.

Jan. 6, 1972.

See also, D.C., 306 F.Supp. 219.

Eckert, Seamans & Cherin, Pittsburgh, Pa., George D. Brodigan, Hartford, Conn., for plaintiff.

Breed, Abbott & Morgan, New York City, Springer & Perry, Pittsburgh, Pa., for defendant.

## OPINION

SORG, District Judge.

The Travelers Insurance Company (Travelers), a corporation engaged in the business of general or "all lines of" insurance for profit, invoking Sections 1 and 2 of the Sherman Anti-Trust Act,[1] seeks relief from the effects of certain practices on the part of the Blue Cross of Western Pennsylvania (Blue Cross), a non-profit corporation engaged exclusively in that phase of the insurance business which deals with the guaranteeing of payment for hospital care. It is

---

[1]. 15 U.S.C.A. Sec. 1: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, in declared to be illegal . . . ."
15 U.S.C.A. Sec. 2: "Every person who shall monopolize, or attempt to monop-olize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be guilty of a misdemeanor . . . ."

stipulated that the business of both Travelers and Blue Cross affects interstate commerce and that this court has jurisdiction over the parties and the subject matter.

The record, which includes the transcript of a comprehensive non-jury trial held before the undersigned, reveals that Blue Cross subscribers and their covered dependents number more than half the population of the relevant market area —namely, twenty-nine counties in Western Pennsylvania—and that during the period 1965–1969, they were the recipients of 62% of all hospital days of service to Western Pennsylvania patients covered by hospitalization insurance. Hospitals accept from Blue Cross in full payment for their services to Blue Cross subscribers their audited costs of service to Blue Cross subscribers as a unit, under the terms of a standard form of contract between Blue Cross and 101 hospitals in and about the relevant market area. In order to cover their financial requirements not incurred by reason of services to Blue Cross subscribers—such as the cost of services to indigent and defaulting patients—the same hospitals charge policyholders of Travelers and other commercial carriers an average of 14% more for their services than they accept as full payment from Blue Cross. Travelers' "cost of claims", therefore, for the same hospital services is 14% higher than that of Blue Cross. Inasmuch as the cost of claims of both Travelers and Blue Cross accounts for 90% or more of their income from subscribers or policyholders, as the case may be, the 14% differential subjects Travelers to a substantial price disadvantage in its quest for hospitalization insurance business. It is also to be noted that Blue Cross' promotional activities, prior to the filing of the instant action, featured the ability of its subscribers to acquire hospital services at rates lower than those charged by hospitals to their other patients and, further, that those hospitals which do not enter into the Blue Cross contract are paid a per diem rate for their services to Blue Cross subscribers which is substantially less than their costs of service. Hence, Travelers presents Blue Cross as a dominant competitor monopolizing hospital insurance coverage by inducing the providers of hospital service into a discriminatory arrangement in favor of Blue Cross subscribers and against the commercial insurance carrier's policyholders.

On the other hand, the activities of Blue Cross in all respects material to this case, including the terms of the contract under attack, are regulated and directed by the Insurance Department of the Commonwealth of Pennsylvania in strict conformity with the provisions of the Nonprofit Hospital Plan Act of 1937, 40 P.S. § 1401 et seq., enacted by the Pennsylvania General Assembly to meet a public health problem described in "The Middle Road", a study report of the Pennsylvania Economy League, as follows:

"In the early 1930's, when the United States experienced one of its worst economic depressions, hospital financing in Western Pennsylvania, as in the country in general, was in difficulty. Voluntary hospitals were under-financed, and it was common for people to forego needed hospitalization because they lacked money to pay the bills. Forced economies resulted in the discontinuance of some hospital services and retarded development in other services.

\* \* \* \* \* \*

As a result, the community of Western Pennsylvania as a whole was not receiving adequate hospital care even by the standards of those days."

In the words of The Honorable Herbert B. Cohen, Majority Leader of the Pennsylvania House of Representatives, and sponsor of the aforesaid Act:

"5. The Legislature of Pennsylvania in approving this law was attempting to meet a severe need of providing citizens of Pennsylvania with hospital care at a cost within their means and also of providing hospitals with a source of financial support which

would place them in a more stable financial position and thereby less dependent upon state and local tax funds. The Legislature therefore was attempting to fill a gap created by commercial insurance companies' underwriting policies which left the mass of Pennsylvania citizens unprotected from hospitalization expenses and hospital bills in many instances unpaid. It proceeded to close this gap by authorizing the creation of nonprofit hospital plans, now known as Blue Cross plans, which through contracts with hospitals would provide hospital services for subscribers and guarantee the payment of their hospital care."

Under the terms of the said Act, Blue Cross, having been previously organized under the Pennsylvania Nonprofit Corporation Law, approved May 5, 1933, P. L. 289, for the purpose of establishing, maintaining and operating such a nonprofit hospital plan became subject to regulation by the Pennsylvania Insurance Department in the following respects: "the rates charged to subscribers  .  .  ., all rates of payments to hospitals  .  .  ., all acquisition costs in connection with the solicitation of subscribers  .  .  ., the reserves to be maintained  .  .  ., the certificates issued  .  .  . representing subscribers' agreements, and any and all contracts entered into  .  .  . with any hospital." (In the same Act, Blue Cross was extended an exemption from taxation and from "all other of the insurance laws of this Commonwealth.") The Blue Cross hospital contract is, therefore, an integral part of Pennsylvania's regulated hospital plan. By reason of the interrelationship of hospital payments and Blue Cross subscriber rates the contract also falls within the ambit of "insurance business". As stated in Securities and Ex-

change Commission v. National Securities, Inc., et al., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969):

"The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance'  .  .  .  . Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance'."

Blue Cross accordingly asserts two defenses—(1) an exemption under the McCarran-Ferguson Insurance Regulation Act and (2) a general denial of any acts which constitute monopolization or restraint of trade within the meaning of the Sherman Act.[2]

Section 2(b) of the McCarran-Ferguson Insurance Regulation Act, 15 U.S.C.A. § 1012, provides:

"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance,  .  .  ."

Since all Blue Cross activities of which Travelers complains occur within the area of state-regulated insurance business, it would appear that, without more, the McCarran exemption should apply. Section 3(b) of the said Act, however, reads as follows:

"Nothing contained in this chapter shall render  .  .  . the said Sherman Act inapplicable to any  .  .  . act of boycott, coercion, or intimidation."

It was only Travelers' allegations to the effect that the Blue Cross hospital contract was obtained through "boycott, coercion and intimidation", then, which enabled its claim to survive a motion for summary judgment on McCarran-Ferguson grounds. See Travelers Ins. Co. v.

2. On Motion for Summary Judgment it has been previously determined that Blue Cross' participation in the Pennsylvania Nonprofit Hospital Plan does not extend to it the Sherman Act exemption generally applied to the governmental actions of a state. Travelers Ins. Co. v. Blue Cross of Western Penn., 298 F.Supp. 1109 (W.D.Pa.1969).

Blue Cross of Western Penn., 306 F. Supp. 219 (W.D.Pa.1969). Travelers, consequently, bears the burden of establishing both an unreasonable restraint of trade under its Sherman Act claim and the accomplishment thereof through "boycott, coercion and intimidation", lest its claim fall under McCarran.

As indicated above, Travelers has localized the source of Blue Cross' dominant competitive position in the discriminatory price advantage emanating from Blue Cross' contract with hospitals. Its target is the heart of the Blue Cross plan—the hospital contract. The contract itself then, as well as the setting in which it originated, must be tested for unreasonable-restraint-of-trade characteristics and elements of boycott, coercion and intimidation.

The contract in issue, approved by the Pennsylvania Insurance Department on January 11, 1967, was the outgrowth of a constant flow of communication between representatives of the Hospital Council of Western Pennsylvania and the Northwest Association of which the various contracting hospitals are members, on the one hand, and representatives of Blue Cross on the other. In this forum hospitals were recognized as a community health service, Blue Cross as a community organization through which the members of the public who chose to do so might pre-pay in periodic installments the costs of their hospital care, and the Blue Cross formula of reimbursement to hospitals as a community-wide problem. This forum also had the benefit of the experience of both hospitals and Blue Cross through a series of previous contracts commencing early in the year 1938. The first contract which became effective early in 1938 provided for a flat per diem reimbursement which was the same for all hospitals. In January, 1951, a second contract was entered into which provided for hospital payment based upon the audited costs of

hospitals. The third contract containing certain refinements of the hospital reimbursement formula based upon audited costs was entered into in 1956. The latter contract remained in effect until the current 1966 contract was approved by the Insurance Commissioner on January 11, 1967. Before any of the contracts mentioned were finalized their terms were thoroughly considered by the Pennsylvania Insurance Department which also conducted exhaustive public hearings on the subject matter. It should also be noted that each revision of the contract and the day-to-day experience of the parties in complying with its terms required occasional requests by Blue Cross for approval by the Pennsylvania Insurance Department of subscriber rate adjustments, some of which were granted, some of which were granted in part only, and some of which were denied in toto. In the course of their negotiations it was made abundantly clear to both the hospitals and Blue Cross that in their participation in the Pennsylvania Nonprofit Hospital Plan certain matters of policy would be inflexible, namely—(1) that hospital reimbursement formulae be based on costs and limited by a ceiling, (2) that the hospital cost of free care be excluded in the application of any reimbursement formula and (3) that the cost of new hospital construction or amounts attributable to capital expansion be excluded from any cost-based reimbursement formula. Within these guidelines numerous proposals were extensively discussed between representatives of the abovementioned hospital associations and representatives of Blue Cross, as a result of which the parties arrived at a hospital-sponsored amendment to the existing reimbursement formula designed to accommodate the specific financial needs of each of the contracting hospitals according to its own classification within any one of nine categories.[3] An appeal

---

3. Statement of Herman M. Somers, Ph.D., one of defendant's expert witnesses:

   "(2) . . . hospitals are grouped into nine categories, based on combina-

   tions of geographic location and teaching reponsibilities of the hospital. The ceiling for an individual hospital is ten per cent above the weighted average of

procedure for those hospitals which might consider themselves aggrieved with respect to reimbursement for service to Blue Cross subscribers was agreed upon and the contract in other respects, as well, reflects the fact that, although the conferees were not in unanimous accord on all its provisions, the current Blue Cross contract is the result of exhaustive negotiation carried on with due regard for the mutual needs and responsibilities of the hospitals and Blue Cross as community service institutions participating in the Commonwealth of Pennsylvania's plan for the efficient maintenance of an essential community health service at the lowest possible cost to the public. On this point the testimony of Walter Rome, Administrator of Children's Hospital, Pittsburgh, Pennsylvania, is typical of the atttiude of the hospitals toward the existing contract with Blue Cross:

"I have been in the hospital field, as I said a moment ago, for twenty some years. I can never remember a time in that entire period when hospital administrators either officially or unofficially or formally or informally were not having conversations regarding the last contract with Blue Cross and whether or not the time was ripe to consider new items that might be introduced as part of a new contract.

You must understand that for the most part inasmuch as hospitals created Blue Cross in the first place, that we look on Blue Cross as the partnership of the hospitals. . . ." Tr. 1143–1144.

\* \* . \* \* \* \*

". . . I remember I was delighted with this contract, because it resulted in something I had been trying to obtain for a long time, and it was my feeling that this was a contract that both the Blue Cross and the hospitals could live with and it was in the best interests of the community and of the hospitals and of Blue Cross. . . ." Tr. 1166.

It is apparent that the overriding motive of both contracting parties was the performance, within the outline of Pennsylvania Insurance Department Regulations, of their role in the implementation of a community health service plan on a non-profit basis—a manifestly legitimate purpose pursued in an atmosphere free of coercive tactics on either side. It is also evident that hospitals voluntarily accept the Blue Cross plan for their own economic advantage. The following testimony of Dr. Herman M. Somers is indicative:

"Yes, the contract it seems to have many benefits for hospitals and a considerable balance of benefits over disadvantages. The chief one is the guarantee of payment which was at least one time extremely significant to hospitals, unpaid bills represents a very major chunk of their costs.

They are guaranteed that they will be paid and they are guaranteed that they will be paid costs and since they are, by and large, non-profit institutions costs is all one can reasonably expect and while costs, of course, are not easy to define, and always subject to disputation and always will be, nonetheless, it is on the basis of costs by a definition that is now generally accepted and very widely used.

And they have the advantage of prompt payment, it is very important financially, I said, and Blue Cross pays currently or concurrently, they often say, with the actual incidence of the costs to the hospital, a matter which is financially advantageous. . . ." Tr. 3300.

In this connection, it must also be added that the record pertaining to Blue Cross' contact with hospitals contains no direct evidence of coercion on the part of Blue

the per diem costs of hospitals within its own group—weighted by the number of patient days at the various institutions in the particular hospital grouping.

\* \* \* \* \*

(6) The contract provides for payment of an additional three percent of the hospital's audited cost in lieu of building depreciation."

Cross, or coerced reaction on the part of any hospital, or of any discussion or arrangement between Blue Cross and any hospital which directly or indirectly touches upon the relationship of any hospital with Travelers or other commercial insurance carriers.

The evidence on the whole preponderates in favor of Travelers to the effect that the methods employed and the plan administered by Blue Cross, when compared with the hospitalization insurance product of Travelers and 300 other commercial carriers, do result in a superior competitive position on the part of Blue Cross of Western Pennsylvania in the relevant market area and in the relevant product market—hospitalization insurance coverage, whether on a group basis or an individual basis. But Travelers has not met its burden with respect to the issues of monopolization or restraint of trade through boycott, coercion or intimidation. As stated before, the evidence discloses no activity or agreement having to do with the relationship of hospitals and Travelers, much less any inducement to the hospitals not to deal with Travelers. The evidence likewise negates the presence of coercion or intimidation on the part of Blue Cross, and Travelers' theory of "inherent coercion" predicated upon the proposition that the hospitals had "no alternative" because of "community pressure" does no more than lend credence to Blue Cross' "thrust upon" defense, which is grounded on the existence of historic accident, superior product, and business acumen as the reasons for its superior competitive position. Community attraction and economic appeal are the antithesis of coercion and intimidation.

■ Recapitulating, this court has concluded that Blue Cross' competitive status was not acquired by boycott, coercion or intimidation; that whatever share of the hospitalization insurance market Blue Cross enjoys is the result of public acceptance uninfluenced by any artificial restraint-of-trade practices on its part; that Blue Cross is not a monopolist, for it not only lacks control over the rate-making effects normally incident to lawful competition, but is without power to establish its own rates; that Blue Cross, therefore, has not violated the provisions of the Sherman Antitrust Act; and that, in any event, Blue Cross is entitled to the McCarran-Ferguson Act exemption.

Not unmindful of the following alert set forth in 54 Am.Jur.2d, Monopolies, etc., § 3, it is deemed appropriate, nevertheless, to enumerate the statements of principle not previously stated which led to these conclusions:

"Legal researchers should be wary of general language in Sherman Act cases. Each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and the opinions in the cases must be read in the light of their facts." 54 Am.Jur.2d, *supra,* citing Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925).

■ The thrust of the Sherman Antitrust Act is the prevention of restraint-of-trade and monopolistic practices which, by unwarranted interference with free competition among the suppliers of products or services, have a tendency to deprive the public of the benefits ordinarily derived from the rivalry of a number of sellers. United States v. Von's Grocery Co., 384 U.S. 270, 275, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 76 S. Ct. 994, 100 L.Ed. 1264 (1956); American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943).

"The purpose of preventing undue restraint of trade is to prevent unreasonably high prices to the purchasers and users of the articles traded in." United States v. Int. Harvester Co., 274 U.S. 693, 701, 47 S.Ct. 748, 751, 71 L.Ed. 1302 (1927).

"In applying remedies for this purpose, however, the fact must not be overlooked that *injury to the public* by the prevention of an undue restraint on, or the monopolization of trade or commerce, is the foundation upon which the prohibitions of the statute (Sherman Act) rest. . . ." [Emphasis and parenthesis added]. Standard Oil Co. v. United States, *supra,* 221 U.S. p. 78, 31 S.Ct. p. 523.

█ Although the possession of a large portion of the relevant market may be a factor in determining the existence of a monopoly, bigness alone does not constitute proscribed monopoly power, and where activities are predominantly motivated by legitimate business aims or where monopoly power is acquired through normal growth and development, as a consequence of having a superior product or business acumen, or through historical accident, the Sherman Act is not offended. Kansas City Star Co. v. United States, 240 F.2d 643, 658 (8 Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957); Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L. Ed. 1277 (1953); United States v. Aluminum Co. of America, 148 F.2d 416 (2 Cir. 1945).

"A business organization which has acquired monopoly power is guilty of monopolization if it undertakes a course of action the consequence of which would be to exclude competitors or prevent competition. Proof of a specific intent is not necessary [as it is under 'attempt to monopolize'] . . . .

However it cannot be required to forego normal competitive business methods to further legitimate business ends, as distinguished from acts which are done with the intent to create or preserve a monopoly, or which would have the consequence of excluding competitors from a relevant market." American Football League v. National Football League, 205 F.Supp. 60, 64

(D.Md.1962), aff'd 323 F.2d 124 (4 Cir. 1963).

Congress in the passage of regulatory statutes such as the Interstate Commerce Act, etc., including the extension of regulatory authority to the states as under the McCarran Act, recognized the fact that the salutary effects of competition may be accomplished by regulation as well.

"Strict regulation and supervision, particularly with respect to rates charged the public—[is] an effective safeguard against the evils attending monopoly, at which the Sherman Act is directed." McLean Trucking Co. v. United States, 321 U.S. 67, 85, 64 S. Ct. 370, 380, 88 L.Ed. 544 (1944).

On the applicability of the McCarran Act, see Ohio AFL–CIO, et al. v. Insurance Rating Board, et al., 451 F.2d 1178 (6 Cir. Opinion filed Nov. 30, 1971).

Finally, it must be kept in mind that, under all the evidence in this case, the only available judicial remedy for Travelers' plight, the enjoining of Blue Cross activities, would necessarily produce a result inconsistent with the basic and ultimate goal of the federal anti-trust laws—consumer protection. The seller's protection is apposite only to the extent that it is not inconsistent with the public's attainment of the highest quality products and services at the lowest possible price.

The previous finding that all challenged Blue Cross activities were conducted in conformity with the Pennsylvania Nonprofit Hospital Plan Act, *supra,* disposes of Travelers' claim based upon alleged violations of the said Act and submitted on the theory of pendent jurisdiction. As to plaintiff's further pendent claim that defendant's alleged acts of boycott, coercion and intimidation violate the Pennsylvania Unfair Insurance Practices Act, 40 P.S. § 1151 et seq., the same reasoning applied above in treating plaintiff's identical Sherman Act allegations is dispositive.

An appropriate Order will be entered.

## ORDER

And now, this 6th day of January, 1972, for the reasons stated in the foregoing Opinion,

It is ordered that the complaint in the above styled action be and the same is hereby dismissed.