**Paul I. GUEST, President of Methodist Hospital, et al.**

v.

**Emmett F. FITZPATRICK, Jr., Dist. Atty. of Philadelphia, et al.**

**Civ. A. No. 75–2306.**

United States District Court, E. D. Pennsylvania.

Feb. 27, 1976.

James D. Crawford, Frank H. Abbott, Susan L. Carroll, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs.

Bonnie B. Leadbetter, Philadelphia, Pa., for Fitzpatrick.

Howard Holmes, Philadelphia, Pa., for Kane.

Denis V. Brenan and William E. Zeiter, Philadelphia, Pa., for Blue Cross.

Before VAN DUSEN, Circuit Judge, and LUONGO and WEINER, District Judges.

WEINER, District Judge.

 This is an action brought by several hospitals, members of the Delaware Valley Hospital Council (hereinafter DVHC) for declaratory judgment and injunctive relief, challenging the provisions of a Pennsylvania law, Act No. 94, 40 Pa.C.S. § 6124(c), effective August 2, 1975. Act No. 94 creates statutory requirements for the termination of contracts between hospitals and certain hospital plan corporations. Jurisdiction of this Court was invoked pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1343(3), and a three-judge court was convened as required by 28 U.S.C. § 2284. The court

has for its consideration cross motions for summary judgment filed by plaintiffs and defendants respectively.[1]

Since the facts are not in dispute, there remain solely questions of law. From our examination of the record, the following facts emerge: On August 15, 1974, the contract between defendant Blue Cross of Greater Philadelphia and plaintiff hospitals expired. Run-out provisions of the contracts between Blue Cross and individual subscribers then began to take effect, and coverage expired on the anniversary dates of the subscription contracts. The last subscriber contracts were to run out on August 15, 1975. During the one-year following expiration of the above contract, negotiations toward a new contract proved to be unsuccessful. The effect of the run-out provisions would have been to limit most subscribers' coverage to that afforded in non-Blue Cross member hospitals. Traditionally, an individual enters into a subscription contract with Blue Cross. In the majority of cases, the insurance plan will obtain hospital services in member hospitals. The coverage afforded is then either complete coverage, i. e., the full hospital service is provided, or the subscriber pays a relatively small portion of the hospital fee. In either event, Blue Cross makes direct payment to the hospital. If the subscriber is admitted to a hospital which is not a member hospital, the subscriber will be fully responsible for his hospital costs and Blue Cross will partially reimburse the subscriber directly. Typically, only a small portion of the total hospital bill is repaid to the subscriber.

In situations in which total coverage is provided subscribers, it is clearly necessary that there be a contractual relationship between Blue Cross and the hospitals. Hence, the term "member hospi-

tals". The contract between Blue Cross and its member hospitals operates on a cost reimbursement formula. Under such a formula, the retail price of hospital services is not paid by Blue Cross. Rather, Blue Cross reimburses hospitals for the cost to the hospitals of providing care to the subscriber, computed in a way that allows, inter alia, for consideration of depreciation and economic inflation factors.

It was the cost reimbursement formula that led to the breakdown of negotiations for new contracts between Blue Cross and the plaintiff hospitals who are represented by the DVHC.

During the one-year period of negotiations, increasing numbers of subscribers lost member hospital benefits in the plaintiff hospitals. On August 2, 1975, the Pennsylvania legislature passed, and the Governor signed, Act No. 94, 40 Pa. C.S. § 6124(c).

Chapter 61 of Title 40 establishes statutory control over hospital plan corporations. Defendant Blue Cross of Greater Philadelphia is a hospital plan corporation within the meaning of the statute. The Hospital Plan Corporation Act generally provides for regulation of hospital plan corporations and specifically requires, inter alia, that all hospital plan corporations obtain certificates of authority from the Pennsylvania Department of Insurance (§ 6102(a)); that hospital plan corporations enter into contracts only with hospitals approved by the Department of Public Welfare. (§ 6121).

Section 6124 of the Hospital Plan Corporation Act, which section Act No. 94 amends, provides:

(a) The rates charged to subscribers by hospital plan corporations, all rates of payments to hospitals made by such

---

1. Due to a stipulation filed 9/25/75, stating that defendants Fitzpatrick and Kane agree not to seek criminal sanctions while Act No. 94 remains subject to constitutional challenge but apparently reserving their right to proceed against plaintiffs after final determination of this suit, there is a case or controversy continuing insofar as plaintiffs seek final injunctive relief. The absence of any demand for damages requires that the Pennsylvania defendants' claims for immunity under the Eleventh Amendment be rejected. See *Edelman v. Jordan*, 415 U.S. 651, 664–65, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662, 673 (1974).

corporations pursuant to the contracts provided for in this chapter, all acquisition costs in connection with the solicitation of subscribers to such hospital plans, the reserves to be maintained by such corporations, the certificates issued by such corporations representing their agreements with subscribers, and any and all contracts entered into by any such corporation with any hospital, shall, at all times, be subject to the prior approval of the department.

(b) Every application for such approval shall be made to the department in writing . . .

Act No. 94 which amends the above section, provides:

*Section 1.* Section 6124 of Title 40, . . . is amended by adding a subsection to read:

§ 6124. Rates and contracts

. . . . .

(c) Maintenance of contractual relationships—.

(1) *Declaration of necessity.*—It is hereby found that many subscribers to nonprofit hospital plans make payments over long periods of time prior to becoming entitled to benefits under such a plan and that it is important in the public interest that the reasonable expectations of such subscribers as to coverage should be fulfilled if possible. It is hereby declared to be essential for the maintenance of the health of the residents of this Commonwealth that subscribers to nonprofit hospital plans be assured receipt of the hospitalization and related health benefits prepaid by them through payments of the rates approved under this chapter and charged by a hospital plan corporation and that to accomplish this essential purpose termination of contracts between hospital plan corporations and hospitals entered into pursuant to section 6121 (relating to eligible hospitals) and this section be subject to prior approval by the department as provided in this subsection.

(2) *Notification period.*—No contract between a hospital plan corporation and any hospital providing for the rendering of hospitalization to subscribers to the hospital plan shall be terminated unless the party seeking such termination gives 90 days advance written notice to the other party to the contract and to the department of the proposed termination.

(3) *Hearing period.*—Whenever a termination subject to paragraph (2) involves contracts with hospitals having more than 5% of the beds in the area served by a hospital plan corporation, the department shall hold public hearings on at least 15 days notice for the purpose of investigating the reasons for the termination. Pending completion of said investigation by the department, termination of the hospital contracts shall be suspended for a period not to exceed six months from the expiration of the period provided for in paragraph (2). All terms and conditions of the contract between the hospital plan corporation and the hospital or hospitals shall continue in full force and effect during said investigation by the department. Based on the record made during the hearings, the department shall make specific findings as to the facts of the dispute and shall either approve termination of the contracts or recommend such terms for continuation of the contract as are in the public interest, based upon the facts, the right of a hospital to be paid its costs for hospitalization services to subscribers and the need of subscribers for efficient, reliable hospitalization at a reasonable cost.

(4) *Negotiation period.*—If the department recommends terms for continuation of the contract, the hospital plan corporation and the hospitals involved shall renew their negotiations in order to determine

whether a new agreement can be reached substantially on the basis of the terms for continuation recommended by the department and pending such negotiations, the termination of hospital contracts shall be suspended for a further period not to exceed 90 days from the date of the decision of the department. If the hospital plan corporation and the hospitals are unable to consummate a new contract within said further period of 90 days, they shall so advise the department. The department shall in that event approve termination of the contracts effective at the end of a further period of 30 days and shall prescribe the form and extent of notice which the hospital plan corporation shall use in advising its subscribers that hospitalization in the hospitals involved is not covered by a contract between the hospital plan corporation and such hospitals.

(5) *Retroactivity.*—Upon the settlement of any dispute between a hospital plan corporation and any hospital pursuant to paragraphs (2) and (4), the terms and conditions of any new contract shall be retroactive to the date of expiration of the contract previously in effect between the parties.

*Section 2.* The procedures established by this act shall apply to:

(1) any termination of contracts between hospital plan corporations and hospitals hereafter occurring; and

(2) any contracts between hospital plan corporations and hospitals under which subscribers received prepaid benefits on or after June 30, 1974 . . . . . Such contracts, if terminated, shall be reinstated as of their original termination and may be terminated hereafter only pursuant to the provisions of this act.

*Section 3.* This act shall take effect immediately and shall be retroactive to

the extent provided in section 2 of this act.

The effect of Act No. 94 on the Plaintiff hospitals is to reinstate the most recent contract between the DVHC represented hospitals and Blue Cross as of its original termination date, namely, August 15, 1974. If the hospitals wish to terminate the contract, they must follow the provisions of the Act. If a new contract is negotiated by the parties and approved by the Insurance Department, that new contract will date back to the termination of the previous agreement. However, since August, 1974,[2] the hospitals have been requiring Blue Cross subscribers to pay for hospital care as is the practice in non-member hospitals. The hospitals are now faced with the prospect of repaying those subscribers and receiving only cost reimbursement from Blue Cross under the 1971 Contract.[3]

The hospitals' contention is that Act No. 94 violates their Constitutional rights. They claim that the retroactivity of the Act, which reinstates the contract which expired on August 15, 1974, is in violation of the Contract Clause and of the Due Process Clause of the United States Constitution. Specifically, the hospitals claim that the Act effects an unconstitutional taking of property without just compensation and also violates the Equal Protection Clause of the United States Constitution.

■ The Contract Clause, Article I, § 10 of the United States Constitution provides that no State shall pass any law impairing the obligation of contracts. The plaintiff-hospitals' contention is that Act No. 94 constitutes a "wholesale evisceration of plaintiffs' contractual rights of termination". We believe that this is not the case at all here.

The Contract Clause came into widespread use in litigation during the depression years when many States passed statutes designed to aid financially distressed citizens, unable to satisfy previously entered-into contractual obliga-

---

**2.** This date is, of course, variable because of the run-out provisions of subscribers' contracts.

**3.** The contract which expired on August 15, 1974 was entered into in 1971 and amended in 1972.

tions. The case of *Home Building and Loan Assn. v. Blaisdell, et al.,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1933) sets forth the standards to be applied to state legislative enactments to determine whether or not such legislation offends the Contract Clause. At issue in that case was the 1933 Minnesota Mortgage Moratorium Law which provided relief from mortgage foreclosure during a declared emergency. In its opinion upholding the statute, the Supreme Court stated:

"Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. The principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court." *Id.* at 435, 54 S.Ct. at 239, 78 L.Ed. at 427.

The plaintiffs' argument is, in essence, that the statutory extension period violates their contract right of termination on ninety days notice as to any contract entered into between the hospitals and Blue Cross. We are of the opinion that the public interest of preserving the health of the citizens of Pennsylvania adequately justifies such a measure.[4] More than 50% of the citizens have health care insurance coverage through Blue Cross. Most, if not all, of these policyholders, it can be assumed, maintain Blue Cross insurance because of the virtually complete coverage offered by Blue Cross at member hospitals. The current contract dispute, with the resulting run-out of subscribers' member hospital coverage eliminated many hospitals in the Philadelphia area from member hospital status.[5] Therefore, numerous Pennsylvanians who had prepaid and expected member hospital subscriber coverage, found their coverage reduced to non-member coverage at many hospitals.

The maintenance of the health and general well-being of its citizens has been found to be a legitimate state concern and has formed the basis of numerous judicial decisions up-holding state legislative action.[6] Likewise, in this case, it is precisely because the public interest is so substantial in the area of health care that legislation governing hospitals and hospital plan corporations has been enacted in Pennsylvania.[7] Act No. 94 is a logical and reasonable extension of that legislation.

We have carefully considered the cases cited by our brother Judge Luongo and find them to be distinguishable.[8] The Supreme Court, in *El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965), stated that it has long been rec-

**4.** The case of *Travelers Insurance Co. v. Blue Cross of Western Pa.,* 361 F.Supp. 774 (W.D. Pa.1972), aff'd 481 F.2d 80 (3d Cir. 1973), cert. denied 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1974), sustained the general provisions of Blue Cross-hospital contracts against charges of violation of the antitrust laws. In that case, it was stated that a study of the health care problem in Pennsylvania by the Pennsylvania Economy League showed that ". . . it was common for people to forego needed hospitalization because they lacked money to pay the bills." 361 F.Supp. 774, 776.

**5.** Thirty-seven (37) hospitals in the Philadelphia area are represented by the DVHC. Non-member hospital coverage for subscribers is approximately 25% of hospital costs.

**6.** See e. g., *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934) in which regulation of the sale price of milk authorized by a New York statute was upheld as being reasonably related to the goal of protecting the welfare of the citizens of New York. In its opinion, the Supreme Court stated that support for this statute could be found from the fact that the milk industry in general was heavily regulated in New York.

**7.** 40 Pa.C.S. § 6101 *et seq.*

**8.** *Fornaris v. Ridge Tool Co., et al.,* 423 F.2d 563 (1st Cir. 1970), rev'd. on other grounds, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1971); *Superior Motors, Inc. v. Winnebago Industries, Inc.,* 359 F.Supp. 773 (D.S.C.1973).

824

ognized that state legislatures have the power to safeguard the vital interests of their citizenry.[9] The distinction to be drawn is not solely between legislation of substantive and remedial contract provisions but, rather, between legislation which affects contractual rights and obligations in purely commercial enterprises and legislation which concerns the health and welfare of the people. The need of Pennsylvanians for medical insurance which enables them to receive hospital care during health crises is a need which will, unfortunately, touch most citizens during their lifetimes. The public interest underlying Act No. 94 clearly justifies any incursions it makes into the contract rights of the parties here.

In *Fornaris v. Ridge Tool Co., et al.,* *supra,* the Court of Appeals found unconstitutional a Puerto Rican statute which provided that contracts between manufacturers and dealers, regardless of their terms, were, with certain exceptions, to be renewable at the option of the dealer and which imposed substantial damages on manufacturers who refused to accede. The court found that the new contractual obligations were excessive in light of the reasonable expectations of the parties. Here in contrast the contracts are still terminable at the end of approximately one year by the hospitals without penalty and their expectations, as a regulated industry are different from those of the commercial manufacturers in *Fornaris.*

Plaintiffs further contend that Act No. 94 violates the Due Process and Equal Protection Clauses of the United States Constitution. Their argument is based in part on the theory that the cost reimbursement formula contained in the Blue Cross-hospital contracts does not include such items as indigent care, charity allowances, uncollectible amounts or research costs and thereby renders the contracts non-compensatory and constitutes a taking of property without just compensation. The validity of such clauses in Blue Cross-hospital contracts has already been upheld.

The case of *Travelers Insurance Company v. Blue Cross of Western Pennsylvania, supra,* upheld Blue Cross-hospital contracts against claims by a commercial insurer that the contractual arrangements between Blue Cross of Western Pennsylvania and hospitals violated the antitrust laws. Specifically, Travelers contended that Blue Cross was a dominant competitor monopolizing the hospital insurance industry by pressuring hospitals to enter into contractual arrangements which favored Blue Cross over other commercial insurers. The favored treatment claim arose from the failure of Blue Cross-hospital contracts to include in the reimbursement formula such items as indigent care, and the resulting lower cost to Blue Cross for hospital services. The court, in its opinion, upholding the above-mentioned contract clauses stated that the Insurance Department had mandated a ceiling on cost reimbursement, and the exclusion from the reimbursement formula of the cost of free care and capital expansion. We see nothing in the challenge to the cost reimbursement formula in the instant case to distinguish it from the reimbursement terms found to be valid in *Travelers.*

We note that the court stated with reference to the Pennsylvania Hospital Plan Corporation Act (40 Pa.C.S.A. § 6101 ff.) in *Travelers, supra,* at page 86 of 481 F.2d:

"In view of our holding that, independent of the McCarran-Ferguson Act, the antitrust laws were not violated, the state of Pennsylvania has not denied Travelers equal treatment in violation of the Fourteenth Amendment. Furthermore, even if McCarran-Ferguson Act protection were necessary to Blue Cross, the facts do not support the proposition that Pennsylvania's regulation of the contract between Blue Cross and the hospitals was without rational purpose, *see, e. g., James v. Strange,* 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972)."

**9.** *Id.* at 508, 85 S.Ct. at 583, 13 L.Ed.2d at 454.

In addition, plaintiffs claim that the loss sustained by virtue of the fact that the above-mentioned costs are not reimbursed is further exacerbated by the ceiling limitation on reinstatement of allowable costs. The question of the economic viability of hospitals as a result of the reinstatement of the previously-terminated contract is a matter for the legislative process as distinguished from judicial inquiry. Under the Hospital Plan Corporation Act, the Insurance Department is authorized to approve or disapprove proposed contracts pursuant to specific guidelines.[10] Act No. 94 itself provides that during the suspension period, the Insurance Department shall either approve termination of the contract or shall ". . . recommend such terms of continuation of the contract as are in the public interest, based upon the facts, the right of a hospital to be paid its costs for hospitalization services to subscribers and the need of subscribers for efficient, reliable hospitalization at a reasonable cost."[11] Plaintiff hospitals have filed a Notice of Intent to Terminate with the Insurance Department and have so notified Blue Cross. Therefore, the question of the non-compensatory nature of the reinstated contract is one to be determined by the Insurance Department.

Plaintiffs argue that Act No. 94 is subject to challenge on constitutional grounds predicated upon the theory that the retroactive application of the statute constitutes a taking of property without due process and plaintiffs further reiterate their previous argument of "impairment of contract." Here, the plaintiffs focus upon the provisions of Act No. 94 which, in substance and effect, provide: (a) that contracts between the hospitals and Blue Cross which terminated in August 1974 be reinstated and (b) that, as a result, subscribers who paid in full for hospitalization during the eleven and a half month period preceding the passage of Act No. 94 be reimbursed for all charges which would have been reimbursed to subscribers under the 1971 Agreement. We find that the statutory reinstatement of terminated contracts and their cost reimbursement formulae and the resulting mandatory reimbursement of subscribers are not unconstitutional.

The unanticipated inability of Blue Cross and the hospitals to negotiate a new contract in 1974 created extreme financial hardship for Blue Cross subscribers hospitalized after the contractual run-out provisions had taken effect. Act No. 94 is designed to avoid the recurrence of such a situation in the future. As part of the remedial nature of the statute, hospitals with long-standing contracts with Blue Cross were required to reinstate the most recent contract provisions. This remedial measure is strikingly similar to remedial measures in other regulatory statutes regarding disputed rates charged by regulated corporations.[12] In *Fleming v. Rhodes,* 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947), the Supreme Court held that rights previously acquired can be legislatively reinstated retroactively. Here, subscribers contracted with and prepaid Blue Cross for health care coverage. As part of that contract, hospitalization at member hospitals was to be provided at little or no cost to the subscriber. The crisis created by the failure of contract negotiations between Blue Cross and the hospitals placed a heavy burden on subscribers. Act No. 94, in its declaration of necessity, states that subscribers are entitled to receive benefits for which they have paid in advance. The subscribers hospitalized between August, 1974 and August, 1975 did not receive those health care benefits. Act No. 94 simply places them in the same position as subscribers hospitalized prior to Au-

---

10. 40 Pa.C.S. § 6124(a) & (b).

11. 40 Pa.C.S. § 6124(c)(3).

12. For example, the Interstate Commerce Act, 49 U.S.C. § 15(7) authorizes the ICC to require that carriers refund, with interest, increased rates found to be not justified. And, in *Nebbia v. New York, supra,* a New York statute authorizing the Milk Control Board to fix milk prices in the state was upheld.

gust, 1974 and subsequent to August, 1975.

The retroactive effect of statutes has been approved where they have filled gaps in the regulatory scheme. See *Fleming v. Rhoades, supra;* C. Hochman, "The Supreme Court and the Constitutionality of Retroactive Legislation," 73 Harv.L.Rev. 692 (1960). The Supreme Court has recognized in the labor field that contractual arrangement may be "continued for a time while further efforts [are] made to settle the dispute." See *United Steelworkers of America v. United States,* 361 U.S. 39, 41, 80 S.Ct. 1, 3, 4 L.Ed.2d 12, 15 (1959). Further, the Supreme Court has held that the taking of property under a program clearly in the public interest is not a denial of due process of law, using this language in *Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424–25, 72 S.Ct. 405, 408, 96 L.Ed. 469, 473 (1952):

> "Of course many forms of regulation reduce the net return of the enterprise; yet that gives rise to no constitutional infirmity. [Citing cases.] Most regulations of business necessarily impose financial burdens on the enterprise for which no compensation is paid. Those are part of the costs of our civilization. . . . The public welfare is a broad and inclusive concept. The moral, social, economic, and physical well-being of the community is one part of it; the political well-being another. The police power which is adequate to fix the financial burden for one is adequate for the other. The judgment of the legislature that time out for voting should cost the employee nothing may be a debatable one. It is indeed conceded by the opposition to be such. But if our recent cases mean anything, they leave debatable issues as respects business, economic, and social affairs to legislative decision. We could strike down this law only if we returned to the philosophy of the *Lochner* [*Lochner v. State of New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937] *Coppage* [*Coppage v. State of Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441] and *Adkins* [*Adkins v. Childrens Hospital of District of Columbia,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785] cases."

The affidavits of plaintiff are far too generalized to justify the grant of summary judgment in their favor. Although the dissenting opinion alleges that plaintiff-hospitals "are compelled to operate at charges they contend are below the level of operating expenses . . . and that are . . . confiscatory," the affidavit of Mr. Armstrong in support of plaintiffs' Motion for Summary Judgment, at paragraph 6, objects to the failure of defendant to pay "the expenses incurred by the hospital in providing care to indigents, in writing off uncollectible accounts other than those of Blue Cross subscribers, in providing charity allowances, and in undertaking certain educational and research activities." Cf. paragraph 61 of supplemental affidavit of Bruce Taylor dated October 14, 1975. Defendant does not require plaintiffs to undertake such expenses, so that plaintiffs have failed to show that the expenses incurred by plaintiffs under Act No. 94 are the cause of the anticipated confiscatory effect of continuing operations under the Delaware Valley Agreement. The affidavits filed by plaintiffs fail to show with any specificity that the cause of their anticipated losses is Act No. 94, as opposed to their desire to provide service for their communities in accordance with the standards of the American Hospital Association (see, for example, page 18 of Plaintiffs' Memorandum, referring to the cost of "educational and research programs, credit losses, and the care of [indigent] patients . . .", and paragraph 15 of Mr. Armstrong's affidavit referring to "health care services required to maintain its accreditation" without making specific such generalities).

■ Plaintiffs' equal protection arguments are founded on the claim that Act No. 94 imposes burdens only on member hospitals, leaving non-member hospitals unregulated. It is true that neither Act No. 94 nor the Hospital Plan Corporation

Act regulates non-member hospitals. The obvious reason seems to be that the Hospital Plan Corporation Act regulates hospital plan corporations and those hospitals with whom they contract. As a result of the agreements between hospitals and hospital plan corporations, members of the general public enter into contractual agreements with the hospital plan corporation for the provision of health care benefits at member hospitals. Hospital plan corporations are required to receive certification from the Pennsylvania Insurance Department.[13] Hospitals which enter into agreements with hospital plan corporations likewise must be approved by the Department of Public Welfare.[14]

And, finally, contracts between hospital plan corporations and hospitals must receive Insurance Department approval.[15] Whereas member hospitals provide virtually total coverage for hospitalization and health care, and are reimbursed under the approved contract formula by Blue Cross, non-member hospitals receive full payment from subscribers, who are then only partially reimbursed by Blue Cross.

The determination of the legislature to regulate only member hospitals by Act No. 94 is not violative of equal protection. Under the equal protection clause, the test applied to any classification scheme set up by a state legislative body is whether the scheme has a rational basis.[16] The burden is on plaintiffs to show that the classification scheme has no rational basis. Since non-member hospitals, by definition, have no contractual arrangement with Blue Cross, they were not included in a statute which regulates hospital plan corporations and, as incident to that regulation, hospitals with whom the corporations contract. In *Nebbia v. New York, supra,* appellant claimed that a New York statute authorizing establishment of minimum resale prices of milk for stores denied him

equal protection because it enabled door-to-door distributors to provide additional services at an almost identical price. Specifically, the Milk Control Board had fixed the minimum price to be charged by a store and by a distributor for a quart of milk at nine and ten cents respectively. In its opinion, the Supreme Court stated: "But if it were shown that the appellant is compelled to buy [from a wholesale distributor and not directly from a farmer] the difference in the retail price he is required to charge his customers, from that prescribed for sales by distributors, is not on its face arbitrary or unreasonable, for there are obvious distinctions between the two sorts of merchants which may well justify a difference of treatment, if the legislature possesses the power to control the prices to be charged for fluid milk." Id., 291 U.S. at 521, 54 S.Ct. at 509, 78 L.Ed. at 947. Because of the substantial difference in subscriber benefits provided by member and non-member hospitals here, it cannot be gainsaid that the statutory distinction has no reasonable basis.

The foregoing shall constitute the findings and conclusions of the court on the plaintiffs' motion for injunctive relief, and such motion will be denied. The joint motions of defendants Blue Cross, Fitzpatrick, Kane and the Insurance Department for summary judgment will be granted, and the motions of plaintiffs for summary judgment will be denied.

LUONGO, District Judge (dissenting).

I agree that this is a matter which affects the health and welfare of the citizens of Pennsylvania. I agree also that the aim of this legislation—to protect the ultimate consumers' need for continued hospital plan protection—is commendable and is certainly within the police power of the state. In my view, however, the legislation misses the constitutional mark when it requires the

---

13. 40 Pa.C.S. § 6102.

14. 40 Pa.C.S. § 6121.

15. 40 Pa.C.S. § 6124.

16. See e. g., *German Alliance Insurance Company v. Hale,* 219 U.S. 307, 31 S.Ct. 246, 55 L.Ed. 229 (1911).

hospitals to remain parties to the contract beyond the bargained for notice period without making some provision to compensate them for the losses they may incur during the period of enforced adherence to the terms of the last negotiated contract. Act 94 works an impermissible impairment of contractual obligations in violation of the Contract Clause of the Constitution, and amounts to a taking of property without just compensation in violation of the Fourteenth Amendment to the Constitution.

The constitutionally offensive aspect of Act 94 is its retrospective effect. The Act, passed August 2, 1975, applies to any contract then in effect between a member hospital and a hospital plan corporation, or any contract "under which subscribers received prepaid benefits on or after June 30, 1974 . . . . Such contracts, if terminated, shall be reinstated as of their original termination and may be terminated hereafter only pursuant to the provisions of this act." Act 94, § 2(2). Since the contracts, entered into in 1971, and amended in 1972, contain run-out provisions requiring payment for hospital services rendered after the termination date to subscribers who had been admitted prior to termination, the Act covers contracts which had, in fact, terminated prior to June 30, 1974. Undoubtedly a state may constitutionally enact legislation imposing conditions on the termination of contracts entered into subsequent to the passage of the legislation, but the state oversteps the bounds when it imposes such conditions upon contracts entered into prior to the adoption of the legislation without providing some measure of protection against loss to the party affected.

Act 94 requires hospitals and the various hospital plan corporations, including Blue Cross, to continue to adhere to the terms of their last negotiated contract for approximately a year beyond the termination date provided in the contract. The effect of the Act is to force contracting hospitals to continue to provide care to subscriber patients at increasing current costs, while reimbursement from the hospital plan corporations is based on previously negotiated cost calculations and formulae which the hospitals claim is insufficient to reimburse them for their expenses.

The cost formulae adopted in the earlier negotiated contracts do not allow to the hospitals, as reimbursable expenses, most community service activities, including care provided to indigents, writing off uncollectible accounts of patients not insured under a contracting hospital plan corporation, providing charity allowances, and undertaking certain education and research activities. Private paying patients or patients with private insurers have, accordingly, always paid a disproportionate share of such expenses. In earlier years there apparently existed sufficient numbers of such patients, and the hospital plan corporation arrangement had sufficient advantages, to make it financially feasible for the hospitals to enter into such agreements. Under the present arrangement, more individuals will likely become subscriber patients because of the relatively lower premiums the hospital plan corporations can charge, since under Act 94 the hospital plan corporations will pay to the hospitals less than private insurers or self-paying patients will be required to pay. Thus an increasingly higher percentage of the hospitals' patients will not be paying their share of the cost of the hospitals' community service activities. Moreover, subscriber patients will be paying for hospital services, through the hospital plan corporation, rates which do not fully reflect the escalating costs caused by the inflationary spiral. The contracting hospitals have thus been forced by the state into furnishing services at charges lower than their actual expenses of furnishing such services. True, the Act does provide that *if* a new contract is negotiated during the extension period, "the terms and conditions of any new contract shall be retroactive to the date of expiration of the contract previously in effect between the parties." *If* a new contract is negotiated between the parties, it would presumably make allowance, satisfactory to the hospitals, for

the hospitals' costs of operation. There is no assurance, however, that a new contract which will fairly compensate the hospitals for their costs, *will* be negotiated and entered into, and no provision is made to compensate the hospitals for their losses incurred in the interim period if no new contract is negotiated.

Act 94 clearly has the effect of modifying the contracts that existed between member hospitals and Blue Cross. The majority does not dispute the modifying effect, but finds that the public interest of preserving the health of Pennsylvania citizens justifies the measure. It is true that where the public welfare requires, the state may use its police power in a manner which, to some degree, impairs the obligations of existing contracts, but the states' power to do so is limited. Here the effective excision of the termination clause from the contract is too substantial an impairment, I believe, to be constitutionally permissible. Both parties to the contract bargained for benefits and burdens they were willing to accept and assume for a certain period of time, subject to their right to terminate at the end of the stated period upon giving 90 days' notice. The excision of that termination provision has the effect of forcing the hospitals to provide, beyond the agreed period, services at charges the hospitals now claim to be below operating cost level, and which are therefore confiscatory.[1]

No matter how great the public need, the state may not, without violating the Fourteenth Amendment, take property without just compensation. The due process and impairment of contract claims are not readily separable, and an impairment claim will usually give rise to a due process claim. *See Fornaris v. Ridge Tool Co.*, 423 F.2d 563, 566–67 (1st Cir. 1970), *rev'd on other grounds*, 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1971). In the present suit, there is concededly an impairment. I believe the impairment to be so substantial as to

violate the Contract Clause, and in any case the impairment works a taking of property without due process of law. The case authority is not to the contrary.

In *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), the Supreme Court upheld a state statute which retroactively extended the period during which a defaulting mortgagor could redeem property which had been foreclosed. Although the contract rights of the parties were altered, the Court found the statute constitutionally sound because the substantive rights of the parties were not impaired:

"The statute does not impair the integrity of the mortgage indebtedness. The obligation for interest remains. The statute does not affect the validity of the sale or the right of a mortgagee-purchaser to title in fee, or his right to obtain a deficiency judgment, if the mortgagor fails to redeem within the prescribed period. Aside from the extension of time, the other conditions of redemption are unaltered. *While the mortgagor remains in possession he must pay the rental value as that value has been determined, upon notice and hearing, by the court.* The rental value so paid is devoted to the carrying of the property by the application of the required payments to taxes, insurance, and interest on the mortgage indebtedness. While the mortgagee-purchaser is debarred from actual possession, he has, so far as rental value is concerned, the equivalent of possession during the extended period." (Emphasis supplied)

290 U.S. at 425, 54 S.Ct. at 235, 78 L.Ed. at 421.

Where legislation has been applied retroactively and has altered the substantive contractual rights of the parties, the Supreme Court has invalidated it. In *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), the Court struck down the

---

1. The affidavits of Messrs. Armstrong, Guest and Williamson may not be sufficient to establish that the imposed rates are confiscatory, but at the very least they raise a material issue of fact for trial.

Frazier-Lemke Act, a federal law which permitted mortgagors to redeem property at its appraised value, regardless of the amount of the outstanding debt. The Court held that the forced surrender of possession and title to property, so long as any part of the debt secured thereby remained unpaid, effected a taking of property without just compensation and could not be justified, however great the public need. The Court distinguished *Blaisdell, supra,* on the ground that in *Blaisdell* no substantive right had been abridged. *Id.* at 581, 55 S.Ct. at 859, 79 L.Ed. at 1599. *W. B. Worthen Co. v. Kavanaugh,* 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298 (1935), reaches the same conclusion. In that case the Supreme Court struck down a state statute extending the period of redemption on grounds it violated the Contract Clause. Again the Court found that the substantive rights of the parties had been altered by the legislation in that the mortgagor was permitted to retain possession of the property without the payment of interest, taxes or rent. In the instant suit, the state has substantially extended the period of the contract and has thereby imposed terms on the hospitals which they claim make it impossible for them to meet their expenses without dipping into reserves. This clearly places the case in line with *Radford* and *Worthen,* and not *Blaisdell.*

*Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952), is as readily distinguishable as *Blaisdell.* That case involved a state statute which permitted employees to absent themselves from work for several hours, without loss of pay, to vote. In upholding the constitutionality of such legislation, the Supreme Court spoke only of the permissibility of state regulations which impose financial burdens upon, and reduce "the net return" from business enterprises. That is a far cry from the plight of these nonprofit hospitals which contend they are being required to operate at inadequate and confiscatory levels of reimbursement.

Even if this were regarded as a "rate" case, which I think it clearly is not, "[a]s of right safeguarded by the due process clause of the Fifth Amendment, [the regulated entity] is entitled to rates, not *per se* excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of property used, at the time it is being used, to render the services." *Denver Union Stock Yard Co. v. United States,* 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469, 1475 (1938). A *fully* regulated utility cannot be compelled to absorb its own costs and not pass them on to the consumer. *Public Service Commission v. Federal Power Commission,* 151 U.S.App.D.C. 307, 316, 467 F.2d 361, 370 (1972). Even temporary rates which are confiscatory are not permissible. *Prendergast v. New York Telephone Co.,* 262 U.S. 43, 49, 43 S.Ct. 466, 468, 67 L.Ed. 853, 857 (1923). *Cf. Beaver Valley Water Co. v. Driscoll,* 28 F.Supp. 722 (W.D.Pa.1939).

In the case perhaps most nearly on point, the Court of Appeals for the First Circuit held unconstitutional, as applied to contracts entered into before its passage, a Puerto Rican law which prohibited a manufacturer from terminating a dealership contract unless justified by a substantial failure of performance by the dealer. *Fornaris v. Ridge Tool Co.,* 423 F.2d 563 (1st Cir. 1970), *rev'd on other grounds,* 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1971). Chief Judge Aldrich based the decision on the Fifth [2] Amendment Due Process Clause, stating that it was unnecessary to deal with the impairment of contracts issue "because the due process clause of the federal constitution provides essentially the same restraint so far as retrospectivity is concerned." He noted that "[i]n determining whether retroactive alteration of contractual provisions are sufficiently minor to be permissible a distinction is sometimes drawn between alteration of substantive rights and alteration of procedures or remedies," and that "[n]o amount of research by parties or amici has discovered a case suggesting that . . ." a statute con-

---

**2.** The Fifth, rather than the Fourteenth, Amendment because Puerto Rico is not a state. See generally, discussion in footnotes 7 and 8, *id.* at 566–67.

verting a contractual relationship from one terminable without cause to terminable only for just cause was not one that worked "a change of great magnitude." *Id.* at 567–68 (footnotes omitted). A similar state statute modifying manufacturers' termination rights under franchise agreements was held unconstitutional, this time on the basis of the Contract Clause, in *Superior Motors, Inc. v. Winnebago Industries, Inc.*, 359 F.Supp. 773 (D.S.C.1973). In my view, the statute in the present case is more egregious than those in *Fornaris* and *Superior Motors* since it prohibits termination altogether during the period of extension.

The Contract Clause is not an absolute barrier to state legislative enactments which have the effect of modifying existing contracts, and there is no question but that a state may regulate enterprises affecting the public interest, but the Constitution sets limits to the manner and degree in which the state may exercise its police power. In the present instance, the failure of the contracting parties to come to an agreement has resulted in an unfortunately hasty reaction by the Pennsylvania legislature which, I believe, exceeds those limits by failing to make provision to protect the hospitals against loss during the period of extension.

Accordingly, I respectfully dissent.