ALUMINUM WORKERS INTERNA-
TIONAL UNION, AFL–CIO, and
its Local No. 250

v.

CHROMALLOY AMERICAN CORPORA-
TION d/b/a Chromalloy
AMPCO Division

No. DC 79–68–K–P.

United States District Court,
N. D. Mississippi,
Delta Division.

March 17, 1980.

pay of Earnest Sims. The evidence before the arbitrator concerned only whether Sims had voluntarily quit his job. After the award, Chromalloy reinstated Sims, but then immediately terminated him for cause on account of prior absenteeism occurring the day after Sims allegedly voluntarily quit. Chromalloy contended that the issue of absenteeism was separate from the issue of the quit and that therefore the court should dismiss the action because of Aluminum Workers' failure to grieve the absenteeism issue as provided by contract. After an evidentiary hearing, at which both sides introduced oral and documentary proof, the case is ripe for disposition on the merits.

## I. FACTS

As the collective bargaining agent for Chromalloy's production and maintenance employees, which included Sims, Aluminum Workers entered into a collective bargaining agreement which provided, among other things, for the submission to arbitration of grievances over alleged violations of the agreement's provisions. Pursuant to a grievance filed by Sims, the dispute on December 7, 1978, was submitted to Arbitrator Ralph Roger Williams of the Federal Mediation and Conciliation Service, who conducted a hearing attended by Sims and Chromalloy's plant manager and supervisory personnel.

The essential facts, as taken from Williams' opinion of January 8, 1979, are as follows:

About five years ago, Chromalloy hired Sims to fill an entry-level position, production worker and laborer, in its shipping department. Chromalloy subsequently promoted Sims to the position of checker, a position which he continued to hold through May 15, 1978. As a checker, Sims helped to load merchandise onto trucks. Sims' foreman was Donald G. Thompson. On several occasions prior to May 15, Thompson had admonished Sims about his work performance. In response, Sims had told Thompson that he wished to be reassigned as a production worker and laborer.

Danny E. Cupit, Jackson, Miss., Patrick J. Riley, Washington, D.C., for plaintiffs.

Dalton McBee, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Invoking jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, plaintiffs Aluminum Workers International Union, AFL–CIO, and Local Union No. 250 (Aluminum Workers) seek to enforce an arbitrator's award against defendant Chromalloy American Corporation d/b/a Chromalloy Ampco Division (Chromalloy) for the reinstatment with back-

On May 15, Sims reported to work at the beginning of his shift, 7 a.m. After lunch, Thompson once again criticized Sims about his job performance. Sims replied that if Thompson was not satisfied with his work, he could "have the tally," or in plant jargon, release Sims from his job. Thompson then went to his office. When he returned, he proffered to Sims for signature a paper reading: "I hereby resign my position as Checker at Ampco, effective this date 5–15–78." Sims signed the paper, then returned to his duties as a checker through the end of his shift.

The next day, May 16, Sims did not come to work but telephoned the shipping manager, Jim Noblett, that for personal reasons he would be absent that day. Noblett told him that he was no longer a Chromalloy employee because he had resigned his job the previous day. Sims replied that he had not resigned his employment but had merely resigned his job as checker so that he could work again as a production worker and laborer. The following day, May 17, Sims came to the plant but was not allowed to work. He then contacted his union and at a company-union meeting repeated his interpretation of the resignation. The plant manager, present at the meeting, reiterated Chromalloy's position that Sims had voluntarily resigned all employment with the company.

At the arbitration hearing, the arbitrator defined the issue as: "Did the Grievant, Earnest Sims, voluntarily quit the employ of the Company on or about May 15, 1978, or was his action in signing a resignation statement only a relinquishment of his classification of Checker? If he did not quit, what shall be the remedy?" The arbitrator found for Sims and ordered him reinstated as a production worker and laborer, with his seniority and other rights restored. Sims also was awarded the backpay of a production worker and laborer to May 15, less earnings from interim employment.

The evidence at trial was that after receiving notice of the award, Sims on January 15 called on Gloria Strotter, the local union president. She told him to report the following day because on January 15 the plant was closed in observance of Martin Luther King's birthday. The next day, at 7 a.m., he reported to work, was seen by plant manager David Constanzi and shipping manager Jim Noblett, and told to return the following day. On January 17, upon Sims' return to the plant, he was handed a notice of discharge signed by the plant manager, which stated: "We are taking this action because of your five (5) absences from scheduled work in the thirty (30) day period ending with and including May 16, 1978." Aluminum Workers, by letter dated January 30, complained that Chromalloy was not living up to the award. Chromalloy's general manager of manufacturing, Herbert Harper, stated in reply that Sims had been reinstated on January 17 but that he was thereupon simultaneously discharged, effective May 16, 1978, because of longstanding company policy on excessive absenteeism.

It is undisputed that Sims had received a written warning on November 3, 1977, for five absences in a thirty-day period. On December 30, 1977, he was suspended three days for five absences in a thirty-day period. On April 10, 1978, Chromalloy suspended Sims five days for seven absences in the previous thirty days. Chromalloy's work rules provided for discharge upon the fourth offense. May 16, the day after Sims resigned his job as checker, he did not report to work. Instead, he called in to report his absence, and, as stated, was told he no longer was a Chromalloy employee. However, if the issue of interpreting Sims' letter of resignation had not arisen, Sims would have been discharged for not reporting to work since his absence on May 16 was the fifth in the previous thirty-day period. Chromalloy, however, did not notify Sims at any time prior to January 17, 1979, that he was discharged for absenteeism under the company's policy. Although Chromalloy at all times maintained that Sims had voluntarily terminated his employment on May 15, the company nonetheless recorded on Sims' file that he did not come to work on May 16.

It is also undisputed that on May 16 Sims was arrested for selling marijuana, and that on June 23 he pled guilty to the charge and received a three-month sentence at a rehabilitation center at Greenville. Chromalloy was aware of these proceedings because Jim Noblett, the shipping manager, read about them in the newspaper. Sims was released from custody on October 5, 1978, and obtained a job with the Shelby Die Cast Company. He worked for that firm from October 9 until January 9, 1979, the date of the arbitration award. Since that date, Sims has been unemployed, although he has unsuccessfully sought work from four firms in the area.

John F. Groth, Chromalloy's Director of Industrial Relations, took charge of the company's defense to Sims' grievance. Before the arbitration he discussed with company officials Sims' absenteeism and incarceration and that because of them Sims might be discharged for violation of company work rules. However, for several reasons Groth, who is not an attorney, decided against submitting to the arbitrator evidence on either violation of company work rules. First, Groth was confident that Chromalloy would obtain a favorable ruling that Sims had voluntarily quit his employment. Second, he was afraid that this evidence might confuse the arbitrator by clouding the quit issue. Third, he expected a further hearing on mitigation of backpay in the event the parties could not agree on the amount. Finally, Groth considered discharge for cause to be a separate labor dispute and therefore improper to raise in the quit proceeding.

After the arbitrator's decision was handed down, Harper contacted Groth for advice. Since backpay was involved in the award, Groth instructed Harper to check company records for layoffs and absenteeism to see whether Sims was entitled to backpay throughout the period from May 15 to date. Chromalloy first determined that Sims, having five years' seniority, was not subject to layoffs, which affected only employees having no more than one year's

service. It was then ascertained from attendance records that Sims had in fact been subject to discharge for his failure to report to work on May 16. .Groth recommended that Sims be discharged for absenteeism because he concluded the award nullified the resignation as though it had never existed.

The collective bargaining agreement between Aluminum Workers and Chromalloy expressly provides in Article V that the arbitrator's jurisdiction of the grievance and his decision shall be restricted to the "application of the specific provision or provisions of [the] Agreement to the specific issue or issues before him," and that his written decision "on any issue properly before him . . . shall be final and binding on the aggrieved employee or employees, the Union and the Company."

Aluminum Workers contends that Chromalloy's action of reinstating Sims and simultaneously terminating him from employment was not a compliance with the arbitration award. Specifically, they urge that the arbitrator was called on to decide the issue of Sims' right to continued employment. In Aluminum Workers' view, Sims' failure to report to work on May 16 and his subsequent incarceration were directly related to a determination of the company's backpay liability, if any; and since Chromalloy failed to assume the burden of presenting to the arbitrator any evidence mitigating backpay liability, Chromalloy is now barred from raising those matters in district court. Chromalloy contends that the discharge of Sims for absenteeism presents a labor dispute entirely separate from the issue submitted to arbitration and should have been separately grieved.

## II. APPLICABLE LAW

Federal statutory law favors the orderly resolution of disputes between labor and management through arbitration. 29 U.S.C. § 173(d).[1] The landmark group of

---

1. Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement.

cases known as the "Steelworkers Trilogy," *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 134, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), firmly establishes the fundamental importance of contract remedies, especially arbitration, in our scheme of industrial self-government. Courts therefore will not examine the merits of a dispute which the parties have submitted to arbitration under an agreement to be bound by the award, for "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 596, 80 S.Ct. at 1360, 4 L.Ed.2d at 1427; *Piggly Wiggly v. Piggly Wiggly*, 611 F.2d 580 (5 Cir. 1980). Instead, the scope of judicial review is extremely limited. "When the question of arbitrability is resolved in favor of arbitration, our only remaining function is to determine whether the award draws its 'essence' from the collective bargaining agreement; we do not review the merits or the factual and legal accuracy of the arbiter's findings." *Int'l Ass'n of Machinists v. Texas Steel Co.*, 538 F.2d 1116, 1120–21 (5 Cir. 1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977). This means that the reviewing court should not disturb the award so long as the interpretation was not arbitrary. *Local 7–644 Oil, Chemical & Atomic Workers Int'l Union, AFL–CIO v. Mobil Oil Co.*, 350 F.2d 708 (7 Cir. 1965), *cert. denied*, 382 U.S. 986, 86 S.Ct. 563, 15 L.Ed.2d 474 (1966).

■ In the case sub judice, the interpretation of Sims' letter of resignation was clearly an arbitrable matter, and it is equally clear that the award draws its essence from the collective bargaining agreement. Nor can it be said that the award was in any way arbitrary or without a basis in fact, for the decision rested upon substantial evidence. Chromalloy does not contend otherwise. Instead, Chromalloy argues that the only issue in the arbitration proceeding was whether Sims had voluntarily quit his employment and that the arbitration did not involve a discharge dispute. We cannot agree with this position. The issue whether Sims would have been discharged regardless of the quit is directly relevant to what remedy the arbitrator could order. Had the arbitrator known of this ground for discharge, he might well have dismissed the stated ground as being moot. Moreover, and as an independent ground for our decision, the essence of the dispute before the arbitrator was whether Sims had a job with Chromalloy after May 15, 1978, so that Sims' discharge for absenteeism on May 16 was inextricably bound to the claim that he had voluntarily quit the day before.

### A. The Issue of What Remedy was Before the Arbitrator.

■ It is true that the collective bargaining agreement between Aluminum Workers and Chromalloy states that the arbitrator's jurisdiction of a grievance and his decision shall be restricted to the "application of the specific provision or provisions of [the] Agreement to the specific issue or issues before him." Plaintiff's Exh. 1, Art. V. Courts have consistently respected such provisions. *See, e.g., United Steelworkers of America v. Enterprise Wheel & Car Corp., supra; General Warehousemen and Helpers Local 767 v. Standard Brands, Inc.*, 579 F.2d 1282 (5 Cir. 1978), *cert. dismissed*, 441 U.S. 957, 99 S.Ct. 1075, 60 L.Ed.2d 1075, 443 U.S. 913, 99 S.Ct. 3103, 61 L.Ed.2d 877 (1979); *Dallas Typographical Union, No. 173 v. A. H. Belo Corp.*, 372 F.2d 577 (5 Cir. 1967). However, this principle does not apply to the remedial portion of the dispute before the arbitrator, as opposed to the merits of the grievance. Even where a narrowly defined issue is submitted, the arbitrator is given wide latitude in fashioning an appropriate remedy. *Mogge v. District 8, Int'l Ass'n of Machinists*, 454 F.2d 510 (7 Cir. 1971); *Lodge No. 12 v. Cameron Iron*

*Works, Inc.,* 292 F.2d 112, 119 (5 Cir.), *cert. denied,* 368 U.S. 926, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961); *Int'l Union of Op. Eng., Local No. 450 v. Mid-Valley, Inc.,* 347 F. Supp. 1104 (S.D. Tex. 1972).

In *Lodge No. 12,* for example, a grievance within the terms of the arbitration clause was presented respecting the discharge of 15 employees for misconduct during a strike. The trial court held the arbitration board had power only to decide whether the employee should be reinstated but not to include an award of backpay for time lost. This result was reached upon reasoning that the remedy of backpay cannot be implied from authority granted to the arbitrator to decide the dispute. Reversing, the Fifth Circuit held:

> [W]hether it is thought to be a part of the substantive right or more a part of the grievance procedure, in the absence of clearly restrictive language, great latitude must be allowed in fashioning the appropriate remedy constituting the arbitrator's "decision."

292 F.2d 119.

In *Mid-Valley, Inc., supra,* the issue submitted to the arbitrator was whether the employer had violated a certain provision in the Union's contract. The arbitrator determined that the employer had breached the agreement and he also awarded wage payments to the Union. At the time of submission to the arbitrator, there had been no express mention of formulating a remedy. The company contended that the award of payments to the Union exceeded the arbitrator's authority. The court upheld the award, saying:

> The arbitrator's express mandate was solely to determine if a breach of contract had occurred. No express mention of formulating a remedy was made. Nonetheless, even where a narrowly defined issue is submitted, an arbitrator must be given considerable latitude in the drafting of an award. *Lodge No. 12, Dist. No. 37, Intl. Assn. Machinists v. Cameron Iron Works,* 292 F.2d 112, 119 (5th Cir.) *cert. den.* 368 U.S. 926, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961). Because rectifying damage

caused by a contract breach is closely linked to identifying the breach itself, that latitude includes remedying any injury. *Texas Gas Transmission Corp. v. International Chemical Workers,* 200 F.Supp. 521 (W.D. La. 1961).

347 F. Supp. 1109.

■ A case closely in point to the dispute sub judice is *Mogge.* The collective bargaining agreement which provided for arbitration was silent as to a specific remedy in case of wrongful discharge, but it did not place any restriction on the arbitrator. After finding the employee had been discharged without cause, the arbitrator ordered reinstatement with 100 weeks backpay. The employer contended that the contract had expired at the time of the award and had not been renewed, and hence the arbitrator exceeded his authority by ordering reinstatement and backpay at a salary and position which the employer claimed no longer existed. However, the employer never presented these matters to the arbitrator, nor was a showing made that the information was unavailable at the arbitration hearing or other reason given for it not being presented. The employer first sought in the district court to show the expiration of the contract as a defense in an action brought to enforce the award. Rejecting this defense, the Seventh Circuit said:

> Since the burden was on [the employer] to prove to the arbitrator that the contract had expired so that he could take this into consideration in fashioning a remedy, it may not now complain that the award is unjustified. On the state of the record presented to the arbitrator, he was fully justified in awarding reinstatement and back pay after the alleged expiration of the contract.
>
> Having failed without cause to bring these extraneous matters to the arbitrator's attention, [the employer] may not supplement the record at this late date. The national labor policy of encouraging private arbitration of labor disputes, because of its potential for expeditious disposition of these matters without resort to the courts, has been thwarted in this

protracted case. To allow [the employer], after arbitration, to have the court supplement the record with information that was available at the time of arbitration would further undermine the very purpose of private arbitration. 454 F.2d at 513. Thus, regardless of how narrowly the arbitrator stated, or the parties regarded, the issue for arbitration, the arbitrator had power to formulate a broad range of remedies. That Chromalloy chose for various reasons not to bring to the arbitrator's attention that Sims would have been discharged regardless of the quit does not detract from the arbitrator's remedial power. Under *Mogge*, Chromalloy had the duty to put the absenteeism issue before the arbitrator if it wished to rely on it in support of the claim that Sims should not be granted backpay since he was no longer a Chromalloy employee. For us to rule otherwise would frustrate the policy of expeditious disposition without recourse to court that arbitration provisions are designed to accommodate.

B. *The Absenteeism Issue was Intertwined with the Quit Issue.*

■ The alternative ground for the court's holding rests not on the arbitrator's remedial powers but on his jurisdiction over the merits of the dispute. The collective bargaining agreement provided that the arbitrator was restricted to applying specific provisions of the agreement to the dispute before him. As noted above, courts respect the perimeters of arbitration procedures the parties have contracted to follow. However, the absenteeism issue was inextricably bound to the quit issue because if Sims would have been discharged regardless of the outcome of the quit arbitration, there would have been no point in pursuing arbitration on the quit. By taking the position before the arbitrator only that Sims had in fact resigned on May 15, Chromalloy must be deemed to have waived any right to complain of his failure to work on any subsequent date. Thus, although Chromalloy did not bring up absenteeism as a ground for discharge, the arbitrator nonetheless had jurisdiction to hear it because

the crux of the dispute he was deciding was whether Sims should be reinstated at Chromalloy. Chromalloy's failure to raise that defense must be considered a tactical choice of litigation strategy for which the district court cannot and should not give relief.

A situation similar to the case sub judice arose in *Staffman's Organizing Comm. v. United Steelworkers*, 399 F. Supp. 102 (W.D.Mich. 1975). In *Staffman's*, the employee was discharged without just cause. An arbitrator ordered the employee reinstated to his former position with backpay. The employer reinstated him in his former position but then immediately transferred him to a different part of the state. The employee brought suit in federal court, arguing that the transfer violated the order of reinstatement. The employer contended that the matter was not properly before the court because the employee had failed to submit for arbitration the validity of the transfer pursuant to the collective bargaining agreement.

The *Staffman's* court interpreted the arbitrator's award to require the employee to be reinstated in his former position in the same location. The employer argued that the transfer should "constitute a separate grievable issue if it were found that [the employee] was reinstated to his old position and then subsequently transferred," noting that otherwise every transfer of a reinstated employee could not be effected "without supervision of the federal courts." *Id.* at 104. The court agreed that in some situations this argument would be valid but not on the facts of the case before it. Ruling against the employer, the court observed:

There would be a tremendous chilling effect on employee grievants if they knew that, after laboring for over three years to exhaust their contractual grievance procedures, culminating in arbitration, they could be transferred (if they prevailed) to the farthest regions of their district and would have no recourse but to begin the task anew. These procedures contracted for by the parties were never intended to force a grievant into the role of a modern day Sisyphus. The

courts, mindful of their proper place in the legislative scheme, should avoid requiring such futile and unnecessary exercises.

*Id.* at 106.

The facts of the present case clearly show that Sims reported at Chromalloy's plant on January 17, 1979, he was not permitted to return to his old job as production worker and laborer and not recognized as an employee. Instead, Sims was stopped at the plant entrance where he was immediately handed a termination notice from the plant manager. He was not discharged after he had in fact been placed on the job or at any time subsequent to the moment of reinstatement. This procedure which Chromalloy characterizes as "simultaneous" reinstatement and discharge can scarcely be viewed other than as an empty formality designed to nullify the arbitration decision. It surely cannot be regarded as good faith compliance with the award.

*Staffman's* is similar to the present case because in both, employees sought reinstatement in the face of the contention that reasons independent of the arbitration ordering reinstatement prevented reinstatement and required separate grievances before review by the court. In fact, the only difference between the cases is that in *Staffman's* the arbitrator knew that transfer was an alternative sanction for an allegedly unruly employee's activities. In the case sub judice, the arbitrator was aware of no ground for termination of employment other than the quit. However, that the absenteeism issue was not put before the arbitrator should not be held to the detriment of Aluminum Workers. What Sims ultimately wanted was not merely an adjudication that he had transferred rather than quit. Sims was litigating to get his job back. In contesting the claim, Chromalloy could not defend on a piecemeal basis but was required to advance all available grounds to show Sims no longer had a job with it. To allow Chromalloy to present Sims' pre-arbitration absenteeism as ground for discharge, where that evidence was readily available yet not offered at the arbitration proceeding, would undermine the very purpose of private arbitration.

We therefore reject Chromalloy's defense that Sims' absenteeism is a separate grievable issue which deprives this court of jurisdiction to enforce the award and find that the defendant has failed to comply with the arbitrator's order of reinstatement.

The arbitrator, in addition to reinstating Sims as a production worker and laborer with seniority and other rights restored, ordered that he be made whole for all pay lost between May 15, 1978, and the date of his reinstatement, less earnings received by him in other jobs after May 15, 1978. The uncontradicted proof is that lost wages accrued to March 15, 1980, amount to $11,922.26, and interim wages which Sims earned at Shelby Die Cast Co. in 1978 and 1979 total $1,780.60. Thus, under the award the net sum of $10,141.66 is recoverable as backpay, together with 8% per annum interest from March 15, 1980, until paid, plus all wages hereafter accruing, less wages from any other employment until the date of Sims' reinstatement.

■ Plaintiffs also seek the recovery of costs and attorney fees for the bringing of this action. When it is clear that the challenge to the arbitrator's decision is without justification, such an allowance is proper. *International Ass'n of Machinists v. Texas Steel Co.*, 538 F.2d 1116 (5 Cir. 1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977); *Dist. 50, U.M.W. v. Bowman Transp., Inc.*, 421 F.2d 934 (5 Cir. 1970). In our view, Chromalloy has failed to present any reasonable basis for its refusal to abide by the arbitration award. Unless the parties can agree upon what sum constitutes costs and reasonable fee for plaintiffs within 10 days from this date, plaintiffs shall promptly submit affidavits setting forth costs as well as the nature, extent, and time invested by counsel in prosecution of this action; and, if controverted, defendant shall file counter-affidavits within 7 days thereafter.